**Louise MALIK, individually and as another and natural guardian of her daughter Julie Malik, a minor, Plaintiff,**

v.

**ARAPAHOE COUNTY DEPARTMENT OF SOCIAL SERVICES, an agency of the County of Arapahoe, Colorado Department of Social Services, an agency of the State of Colorado, Aurora Police Department, and agency of the government of the City of Aurora, Myrlene C. Thorpe, and Roberta D. Coleman, Defendants.**

No. Civ.A. 95–K–144.

United States District Court,
D. Colorado.

Nov. 26, 1997.

Daniel M. Reilly, Nina H. Kazazian, McKenna & Cuneo, L.L.P., Denver, CO, for plaintiff.

Charles H. Richardson, Julia A. Bannon, Office of Aurora City Atty., Aurora, CO, Marc F. Colin, Douglas Jewell, Richard A. Stubbs, Bruno, Bruno & Colin, P.C., Denver, CO, for Aurora Police Dept. and Roberta Coleman.

Edward M. Caswall, Alperstein & Covell, P.C., Denver, CO, for Arapahoe County Dept. of Soc. Services and M. Thorpe.

## MEMORANDUM OPINION ON RECOMMENDATION OF MAGISTRATE JUDGE

KANE, Senior District Judge.

This case is before me on the parties' Fed.R.Civ.P. 72(b) objections to the February 7, 1997 Recommendation of the Magistrate Judge recommending that I(1) grant the Motion for Summary Judgment on Behalf of Defendants Myrlene Thorpe and the Arapahoe County Department of Social Services; and (2) grant the Combined Motions of the City of Aurora and Roberta Coleman to Dismiss State Law Claims and for Summary Judgment as to Civil Rights Claims. I sustain the objections, reject the recommendation, review the motions de novo, and deny each of them.

## I. BACKGROUND AND PROCEDURAL HISTORY.

Plaintiff Louise Malik (Malik) is a mathematics teacher at Aurora Community College and mother of Julie Malik (Julie). In June 1993, Malik's husband was killed in an automobile accident. Malik was 36 years old at the time and Julie was three.

On January 11, 1994, Malik reported as requested to the Aurora Police Department (APD) to answer questions about photographs of Julie the authorities believed were pornographic. Roberta Coleman, an APD detective, learned the photographs had been taken six months before by Malik's brother who lived in New York. Coleman asked to schedule an interview with Julie. After the interview, Malik retained Norman R. Mueller as counsel and Mueller attempted to negotiate with Coleman over the next few days to establish procedures and conditions under which the interview would ensue.

When no interview had been scheduled by January 24, Detective Coleman spoke with Myrlene Thorpe, a social worker with the Arapahoe County Department of Social Services, who then obtained an *ex parte* order for temporary custody from an Arapahoe County magistrate judge. The magistrate was not told Malik was represented by counsel, or that the alleged perpetrator, Malik's brother, did not live in Colorado. Coleman and Thorpe went to the Malik home to execute the order accompanied by two uniformed police officers. Coleman and Thorpe waited in their car until Malik arrived home with Julie, then entered the garage with the police officers and took Julie into the waiting police car.

Detective Coleman interviewed Julie the following day, and Julie was returned to her mother that afternoon. No charges were ever filed.

Louise Malik initiated this action in January 1995, claiming Defendants' conduct in seeking and obtaining the *ex parte* order violated the constitutional rights of both mother and daughter. Malik asserts Defendants' seizure of Julie constituted false arrest

and imprisonment, and claims it was effected in retaliation for her having retained counsel. Malik claims Defendants Coleman and Thorpe conspired to obtain the order through misrepresentation and omission, knowing Julie was in no immediate danger. Malik seeks damages for these alleged deprivations under 42 U.S.C. § 1983, as well as under various state law theories of relief.

In separate motions, Defendants Coleman and the City of Aurora, and Defendants Thorpe and the Arapahoe County Department of Social Services, claimed they were immune from suit and moved for summary judgment on Malik's § 1983 claims. Thorpe and the Department of Social Services also moved to dismiss Plaintiffs' state law claims.

The motions were referred to the Magistrate Judge, who issued his written recommendation on February 7, 1997. The Magistrate Judge found Malik had failed to defeat the qualified immunity defenses of Defendants Coleman and Thorpe, and also found Defendant Coleman absolutely immune for her actions in executing the seizure order. Consequently, the Magistrate Judge recommended the state law claims be dismissed for lack of supplemental jurisdiction.

While the motions to dismiss and for summary judgment were pending, Malik moved for the voluntary dismissal with prejudice of Defendants City of Aurora (motion filed October 22, 1996) and Arapahoe County Department of Social Services (motion filed January 17, 1997).[1] On March 18, 1997, Malik also moved voluntarily to dismiss five of six state law claims (claims Three through Seven of her Complaint). I granted the motion, but also granted Defendant Coleman's request to reserve the right to seek attorney fees and costs related to the defense of those claims voluntarily dismissed.[2]

On March 20, 1997, Defendant Thorpe moved for reconsideration, seeking leave to respond in order to ask that dismissal either be with prejudice or conditioned on an award of fees. I granted Thorpe's motion and accepted her response for filing. I now reaffirm my order granting the motion for voluntary dismissal and will order claims three through seven of Malik's Complaint dismissed with prejudice. I will hold the fee issue in abeyance pending resolution of Malik's claims in their entirety.

Accordingly, three claims for relief remain pending against two defendants in this case: These are Malik's claims against Defendants Coleman and Thorpe for (1) deprivation of Plaintiffs' constitutionally protected rights to familial association, privacy, counsel, freedom from unlawful searches and seizures, and due process in violation of 42 U.S.C. § 1983; (2) conspiracy to deprive Plaintiffs of these rights; and (3) outrageous conduct, pursuant to which Malik seeks exemplary damages.

## II. *LEGAL STANDARDS.*

Rule 72(b), Fed.R.Civ.P., permits me to accept, reject or modify a magistrate judge's written recommendation on dispositive motions. My review is *de novo* upon the record of any portion of the magistrate judge's disposition to which objection is made. Because Plaintiffs object to each of the findings and conclusions of the Magistrate Judge, I review Defendants' motions anew.

Defendants' motions seek to dispose of Plaintiffs' federal civil rights claims based on the affirmative defenses of absolute and qualified immunity. Immunity defenses protect defendants not only from liability, but also from suit. Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by "overriding considerations of public policy." *Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988).

---

1. As part of the stipulation to dismiss the City of Aurora, the parties agreed to bear their own costs and attorney fees. The Aurora Department of Social Services expressly reserved the right to seek fees and costs after entry of final judgment in the overall action. No formal order of dismissal having been entered on those motions, I will grant them *nunc pro tunc* to the date of filing as part of the instant Memorandum Opinion and Order.

2. Coleman filed her Motion for Attorney Fees on April 3, 1997.

## A. *Coleman's Defense of Absolute Immunity.*

The Supreme Court has been sparing in its recognition of claims to absolute official immunity. *Forrester*, 484 U.S. at 219, 108 S.Ct. at 539. In addition to judges themselves, the defense of absolute immunity may be invoked to shield from liability for damages those "who [are] integral parts of the judicial process." *Butz v. Economou*, 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978). As applied in the Tenth Circuit, police officers performing "ministerial functions" such as carrying out a trial judge's order to remove an individual from a courtroom are "integral parts" of the judicial process and are absolutely immune from suit. *Valdez v. City & County of Denver*, 878 F.2d 1285, 1287 (10th Cir.1989). Social workers and police officers whose actions in removing children from their parents are "not integral to the judicial process," however, are entitled only to qualified immunity. *Spielman v. Hildebrand*, 873 F.2d 1377, 1383 (10th Cir. 1989) (citing *Whitcomb v. Jefferson County Dep't Social Servs.* 685 F.Supp. 745, 746–47 (D.Colo.1987)).

The Magistrate Judge relied on *Valdez* to find Detective Coleman absolutely immune for her actions in executing the seizure order. I disagree.

Despite the perceived public benefit of better decisions by public officials, the Supreme Court acknowledges that absolute immunity detracts from the "ideal of the rule of law" in particular cases. *Spielman*, 873 F.2d at 1381 (citing *Forrester*, 484 U.S. at 223, 108 S.Ct. at 542). I am therefore instructed to be " 'cautious in recognizing claims that government officials should be free of the obligation to answer for their acts in court.' " *Id.* (quoting *Forrester* ).

The scope of absolute immunity "extends no further than necessary to protect ... public policy interests." *Spielman* at 1382 (citing *Harlow*, 457 U.S. at 811, 102 S.Ct. at 2734). In the instant case, Coleman is alleged to have contacted Malik knowing she was represented by counsel and then to have conspired with Thorpe to circumvent counsel by misleading the magistrate judge into issuing an ex parte seizure order. Viewed in the light most favorable to Malik, the summary judgment evidence indicates Coleman did so knowing Julie was in no imminent danger and for the purpose of retaliating against Malik for having retained counsel. These actions were neither "integral to the judicial process" nor, as in *Valdez*, "merely ministerial."

The Tenth Circuit in *Snell v. Tunnell*, 920 F.2d 673, 691–92 (10th Cir.1990) addressed a similar issue, rejecting the absolute (and qualified) immunity defenses of state department of social services workers who assisted or acquiesced in the use of false information to obtain an ex parte order to enter plaintiffs' home to further their child abuse investigation of plaintiffs and to retaliate against them. In *Snell*, the department used allegations of child prostitution and pornography to obtain the order knowing those allegations were not supported by their investigation up to that time. 92 F.2d at 678–80.

While agreeing the tasks of social workers and police officers who investigate child protection matters "are clearly matters of compelling interest and importance to the public," the Tenth Circuit found it "could [not] be said that when these investigators allegedly violate a citizen's constitutional rights they are entitled to absolute immunity." *Id.* at 691. The Tenth Circuit rejected the argument under *Valdez* that defendants were performing "ministerial tasks," finding "no evidence" that the judge had "ordered" the department attorney who applied for the order to do so using "false allegations." *Snell*, 920 F.2d at 694 n. 19. The Court concluded immunity issues must be "strictly construed" and overruled previous district court decisions that had determined absolute immunity to be appropriate for social workers. *Id.* at 691. The Court extended its ruling to police officers engaged in the same conduct. *Id.*

*Snell* is controlling authority in this case and compels the rejection of officer Coleman's defense of absolute immunity.

### B. *Qualified Immunity.*

Having rejected the defense of absolute immunity, I proceed to the question of whether either Coleman or Thorpe is entitled

to qualified immunity. In evaluating the defense of qualified immunity I compare the "objective reasonableness" of defendant's conduct with the state of he law at the time of the alleged violation. *Snell v. Tunnell*, 920 F.2d at 696. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), *quoted in Snell* at 696.

Reliance on the objective reasonableness of an official's conduct as measured by reference to clearly established law is intended to strike a balance between the individual's right to redress and the avoidance of unnecessary disruption of government. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The use of an objective standard is also intended to facilitate resolution of insubstantial claims on summary judgment. *Harlow* at 818, 102 S.Ct. at 2738.

█ Once a defendant raises the defense of qualified immunity, plaintiff must " 'come forward with facts or allegations to show both that the defendant's alleged conduct violated the law and that law was clearly established when the violation occurred.' " *Snell*, 920 F.2d at 696 (quoting *Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 646 (10th Cir.1988)). *Applied in Spielman*, 873 F.2d at 1383 *and Hollingsworth v. Hill*, 110 F.3d 733, 737 (10th Cir. 1997). Once plaintiff clears these hurdles, the defendant assumes the normal summary judgment burden of establishing that " 'no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and information the defendant possessed at the time of his actions.' " *Hollingsworth*, at 737–38 (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir.1991)).

Thus, the issue before me on the instant motions is (1) whether Malik has alleged a deprivation of federal rights sufficient to state a claim under 42 U.S.C. § 1983 and, if so, (2) whether those rights were clearly established at the time of the deprivation thereby divesting defendants of qualified immunity from suit. If the evidence presented by Malik raises genuine issues of material fact as to the objective reasonability of Defendants' actions given the clearly established law, then Defendants' motions for summary judgment based on qualified immunity must be denied. Only if they establish that no reasonable trier of fact could find their actions unreasonable will Defendants be entitled to summary judgment.

## III. DISCUSSION.

Rule 56(c) of the Federal Rules of Civil Procedure permits entry of summary judgment where the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The facts presented, and appropriate inferences that may be drawn from them, must be construed in the light most favorable to the nonmoving party. *Id.* If a reasonable trier of fact could not return a verdict for the nonmoving party, summary judgment is proper. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The very purpose of a summary judgment action is to determine whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). To avoid summary judgment, the nonmoving party therefore must refer to specific facts, beyond those in the pleadings, and demonstrate the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *White* at 360. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *see White* at 360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10, 91 L.Ed.2d 202 (1986).

### A. Facts.

I will assume the following facts to have been established in considering the instant summary judgment motions:

In June 1993 when Julie Malik was three years old, her father was killed in an automobile accident. The Maliks had been experiencing marital difficulties but had reconciled at the time of the accident.

In August 1993, Julie accompanied her mother, her mother's parents and her mother's brother on vacation. During the trip, Malik's brother, Jim Maszle, took approximately ten rolls of photographs. Most of the pictures were snapshots of scenery, family and friends. A small number of them, between 5 and 10, were of Julie. Some of the pictures depicted Julie sleeping with an open robe exposing her genital area, and appeared to have been posed. Others showed Julie in a standing position with her hands to her sides under her panties. These photos focused on Julie's torso, having been framed from Julie's chin to her thighs. Dark areas could be seen on Julie's abdominal area. Malik was not present when the sleeping and torso shots were taken, although she was aware her brother had taken pictures of Julie asleep.

Malik sent the undeveloped film to a Texas processing plant for developing. Concerned the pictures were potentially pornographic and about what he thought might be bruising on the child's torso, a plant employee brought the pictures to the attention of his supervisor. The supervisor shared the photos with owner Gary Stallons, who contacted the Fort Worth Police Department and the Postal Inspector. The Fort Worth authorities agreed the photographs warranted further investigation, and turned them over to the Denver Postal Inspector.

Denver Postal Inspector enforcement officer Pat Carr contacted the Aurora Police Department about the photographs on January 6, 1994. Shortly thereafter defendant Coleman, a detective with the Aurora Police Department, attempted to visit Malik, who was not home. Coleman left a business card on the dashboard of Malik's car asking Malik to contact her. At the time, Malik was in Pittsburgh with Julie visiting her mother.

When Malik returned home on January 10, 1994, she found the card. Coleman followed up the next day, calling Malik at work to ask her to come to the station for an interview. Without knowing the subject of the investigation, Malik agreed to come down to the police station immediately. The day, January 11, 1994, was Julie's fourth birthday.

Once at the station, Detective Coleman disclosed the nature of the investigation and advised Malik of her Miranda rights both verbally and in writing. (*See* Malik Dep. [attached as Ex. 5 to Pls' Corrected Combined Resp. to Defs.' Mots. Summ.J.] at 55:23–57:24.) The written advisement stated Malik would be asked about "child pornography" and specifically stated Malik had the right to an attorney and to have him present during questioning. Malik signed the document without requesting counsel and Coleman began questioning her about five or six of the photographs of Julie. Inspector Carr was also present during the questioning.

Malik told Coleman the pictures had been taken in August 1993 by Jim Maszle, her brother, an artist and painter who lived in New York. The questions quickly turned to the torso shots and Malik was asked whether she was there for the taking of those photos (she was not) and asked if she knew who "untied" Julie's robe. (Malik Dep. at 59:12–18, 65:10–16.) When Inspector Carr told Malik that the sending or receiving of photographs depicting child genitalia through the U.S. Postal Service was a felony, Malik stated, "I really feel like I need to have a lawyer." (Malik Dep. 67:8 – 68:2.) When Coleman told her she "didn't need" to hire an attorney and said all they needed were "reasonable explanations,"[3] Malik continued to answer questions. (*Id.* at 68–71.)

Five to ten minutes later (*see id.* at 78-22 – 79:4), Malik was shown a blow-up of a torso shot and asked if a large shadow that appeared across Julie's abdomen was a bruise. Malik, describing herself as "terrified" at the prospect of having to prove to Coleman and Carr six months after the fact that Julie did not have a bruise in August,

---

3. Coleman denies Malik expressed a desire for counsel and contends Malik merely asked her opinion of whether she "needed" a lawyer. For the purposes of summary judgment, I accept, as I must, Malik's testimony as true.

said, "My God, it's a shadow" and again stated "I really think I need to have a lawyer present." (*Id.* 76:13 – 77:20.) According to Malik, Coleman's response was the same: "[I]f you can just give us reasonable explanations, this will probably all go away." (*Id.* at 77: 10–13.) Malik continued to cooperate and was asked about her brother.

Malik described her brother as an artist and painter, and told Carr and Coleman that he also was interested in photography. (*Id.* at 78:12–21.) She reiterated that Maszle lived in New York and agreed to have him contact Coleman. (Coleman Dep. [Ex. 2 to Pls.' Combined Resp. at 100:1–16.) The interview concluded, and Coleman told Malik her statement would be presented to the district attorney who would then decide whether to go forward with the investigation or to close it. (Malik Dep. at 82:3–13.)

That same evening, Malik contacted her brother in New York and asked him to call Coleman to discuss the matter. (Malik Dep. at 82:21 – 83:7.) The next day, on January 12, 1994, Maszle called Coleman and left a message with his telephone number in New York. (Coleman Dep. at 229:16–25.) Coleman returned the call on January 13. After reading Maszle his Miranda warnings, Coleman asked about the photographs. (Investigator's Rep. [attached as Ex. 8 to Pls.' Combined Resp.] at AC00005; Coleman Dep. at 230:1–3.) Maszle acknowledged openly that he had taken the photographs and denied having any prurient interest in doing so. (Investigator's Rep. at 3; Coleman Dep. at 230:8–20.)

Coleman called Malik on January 14 to schedule an interview with Julie for January 19. (Malik Dep. at 98:3 – 100:18.) Concerned, Malik contacted a friend who was a psychologist. (*Id.* at 12:7–20, 102:18–23.) At the psychologist's suggestion, Malik called the Department of Social Services to inquire about securing a child advocate to meet Julie and attend the interview with her. (*Id.* at 12:7–20.) Malik was told the Department had no such advocate on staff. (*Id.*) Malik then contacted an attorney and was referred to Mueller. Malik spoke with Mueller on January 17, 1994 and retained him at that time to assist her in her contacts with the Aurora Police Department and to protect Julie's interests in the interview. (*Id.* at 150:11–19.)

Mueller called Coleman on January 17 to advise her he was representing Malik and hoping to discuss the terms of the scheduled January 19 interview with Julie. Coleman was not in and Mueller left her a message. Coleman called back the following day, January 18. (*See* Coleman Dep. at 273:15–21, 286:23 – 287:1, 288:7–18; Mueller Dep. [Ex. 7 to Pls.' Combined Resp. to Defs.' Mots. Summ. J.] at 26:10 – 30:10.) Coleman's first statement to Mueller was she had another case that took priority and needed to reschedule the interview with Julie. (Mueller Dep. at 26:20 – 27:5.) They discussed Coleman's availability and Mueller stated he would check with Malik regarding hers.

When Coleman gave Mueller the impression that she also wanted to reinterview Malik, Mueller stated he would not permit another interview with her until he knew more about the case. (Mueller Dep. at 27:23 – 28:3.) At that time, Mueller stated Coleman "became very belligerent" and, in a "flareup" he perceived to be "out of the blue," told him "you are not going to keep me from interviewing this child." (*Id.* at 28:4–18, 31:2–14.) Mueller testified Coleman said he could "cooperate" or they could "do it the hard way" and she would "get a court order." (*Id.* at 28:8–9.) Mueller attributed Coleman's reaction to her having misunderstood that he was talking about Malik, not Julie, a misunderstanding he described as "very puzzling" given that it occurred as they were discussing alternative dates for Julie's interview, which Coleman, not he or Malik, had cancelled. (*Id.* at 30:24 – 31:14.)

During this conversation, Coleman described briefly the nature of the investigation and the photographs, and stated APD and the Department of Social Services were "concern[ed]" about the apparent bruising on Julie's torso. (Mueller Dep., 29:7–20.) When Mueller stated he would need to see the photos, Coleman initially refused. (*Id.*) After Mueller "ma[d]e [his] case," Coleman agreed to discuss the matter with Carr. (*Id.*)

Knowing Malik to be represented by counsel and having already discussed the matter with him, Coleman called Malik directly the following day to reschedule the interview with Julie. (Malik Dep., 97:5 –100:20.) Malik testified she immediately told Coleman she had hired an attorney and asked Coleman why she was calling her instead of him. (*Id.* at 98:12–16.) Malik said Coleman's response was that "this has nothing to do with your attorney . . . . this has to do with Julie." (*Id.* at 98:20–22.) When Malik stated she was concerned about suggestive questioning and how the interview was to be conducted, Coleman described her qualifications and offered to conduct the interview at Julie's preschool or daycare. (*Id.* at 98:22 – 99:11.) Coleman dismissed Malik's request for video- or audiotaping the interview as "only happen[ing] on TV" and repeated that, regardless of Malik's protests, "I am going to interview your daughter." (*Id.* at 99:16 – 100:14.) Malik described Coleman as coming across "very forcefully" during this conversation, like a "bully," and that she felt "terrorized." (*Id.* at 99:10–12.) Understanding Coleman's position to be that "we're going to do this, whether your attorney likes it or not," Malik agreed to reschedule Julie's interview for 6 p.m. the following Friday, January 21, 1994. (*Id.* at 100:12–14.)

On January 20, Mueller faxed Coleman a letter admonishing her for contacting Malik directly after they had discussed the matter the day before and reiterating his request that all contact be through counsel. (Letter dated 1/20/94, attached as Ex. 9 to Pls.' Combined Resp.) Mueller also repeated that Malik would "cooperate fully in arranging an interview with Julie," but that the interview "must be conducted under circumstances which are in Julie's best interest." (*Id.*) Consistent with Colorado statutes governing interviews of children in sexual abuse cases and in accordance with suggestions made by Dr. Kathryn Jens, a child psychologist Mueller had consulted, Mueller asked that the interview be videotaped, that Malik and Jens be allowed to attend, and that he and Dr. Jens be provided a list of questions before the interview so the parties could discuss eliminating any that were improperly suggestive. (*Id* .) Mueller stated neither he nor Jens could make the January 21 time Coleman had arranged with Malik, but offered January 28 or the week of January 31 as alternative times for the interview.

Coleman testified that she did not pick up the letter until the afternoon of January 21. (Coleman Dep. 250:18–21.) On January 20, the same day Mueller faxed his letter, Coleman met with Myrlene Thorpe and Bob Ledwith at the Aurora police station to "review the pictures and discuss the case." (Coleman Dep. 239:16 – 240:21, Thorpe Dep. [Ex. 10, Pls.' Combined Resp.] 65:14 – 71:11.) They focused on the torso shots and the alleged bruises. Ledwith opined at the meeting that he "did not believe that the darkened places on the photographs necessarily represented bruising," and recommended they contact an expert in photography. (Thorpe Dep. 70:19–6.) Thorpe described a similar conversation with Ledwith earlier in the day, and said with regard to his recommendation that she "respected his expert opinion." (*Id.* at 64:18 – 65:15.)

During the January 20 meeting Coleman told Thorpe about her conversation with Mueller two days before and discussed with Thorpe the need for a court order "of some sort" because Mueller "was not going to allow [her] to have access to Julie." (Coleman Dep. 241:24 – 243:19.) Coleman's notes included the following handwritten statement: "Draw it up, court order, Monday, court Tuesday," and then a bracket saying "Plan of action." (Coleman Dep., 241:3–23.) The "plan" according to Coleman, was a "joint" or "cooperative" plan between herself, Thorpe, the Aurora Police Department, and the Department of Social Services to circumvent Mueller and obtain a court order "[i]f Mr. Mueller and Mrs. Malik . . . did not show up for appointments or provide Julie for our interview." (*Id.* at 246:2–247:20.) Thorpe's assistance was necessary, according to Coleman, because "getting a court order isn't something [she] would do." (*Id.* at 244:7–12.)

On January 21, Thorpe received a phone call from Department of Social Services colleague JoAnne Slater telling her Coleman had called for her and sent her a fax. The fax was Mueller's January 20 letter.

(Thorpe Dep. 86:6–16.) Thorpe testified at her deposition that she then called Coleman and that Coleman told her, in an "escalated" tone, of Mueller's "cancellation" of the interview and of the parameters he had outlined for an interview of Julie. (*Id.* at 88:8 – 889:13.) Thorpe testified she and Coleman agreed the parameters were "generally unacceptable to both of us" (*id.* at 89:16–21) and that the time frame was also unacceptable because they were already "outside the [72 hour] time frame of the 'mild' risk" category. (*Id.* at 90:16–19.)

Thorpe called Mueller as soon as she hung up with Coleman. (Thorpe Dep., 93:11–14.) Mueller described Thorpe as "friendly" and "congenial" on the phone, and described her position as "this is no big deal, we're going to close this case .... [a]ll we need is the interview, and let's just get this over with." (Mueller Dep., 70:11–23.) Mueller testified they talked at length, but did not agree on the terms of the interview. (*Id.* at 70:18–23.) Thorpe suggested consulting with the Arapahoe County Attorney's office, and the conversation ended with Mueller believing there was a "decent chance" of negotiating the matter. (*Id.* at 70:18 – 71:2.)

Thorpe viewed the conversation with Mueller differently. Thorpe stated she "tried to explain to [Mueller] how inappropriate [his] demands were," and "how important it was for [her] to ascertain the child's safety." (Thorpe Dep., 94:1–7.) She described Mueller as "insist[ent]" and "accusatory in his tone," particularly with respect to the videotaping of the interview, which Mueller told her the law now required. (*Id.* at 96:4–16.) Thorpe said she was unaware of any videotape requirement and agreed to consult with the County Attorney.

Thorpe contacted Lynn Graves (n/k/a Lynn Plis) of the County Attorney's office to ask for direction. (Thorpe Dep. 110:5–10, 112:7–8.) Thorpe was less than forthcoming with Graves, merely describing the photographs and telling her Norm Mueller was trying to impose conditions on the interview she found unacceptable. (*Id.* at 110:16–19, 113:5–11.) Other than the videotaping request, Thorpe did not ask Graves about Mueller's conditions and did not offer to send

Graves copies of Mueller's letter, the intake form or Coleman's notes. (*Id.* at 111:2–15.) Thorpe testified she was not asking Graves to advise her about the reasonableness or tenability of Mueller's conditions; she was asking for advice on "[h]ow to get the interview." (*Id.* at 111:16 – 112:8.) Graves told Thorpe she would call Mueller and get back to her. (*Id* . at 110:21 – 111:1.)

Thorpe called Graves back early Monday morning, January 24, 1994. (Thorpe Dep. 139:1–3.) Thorpe asked if Graves had "been able to determine anything about the ... stated ruling that videotaping was mandatory" and asked if she had "contact with Mr. Mueller." (*Id.* at 139:4–11.) Graves said she had not reached Mueller and was "not aware" of any rule regarding videotaping. (*Id.* at 139:20–24.) Thorpe asked Graves what could be done "rather than getting a verbal order and picking up the child," stating she expressed to Graves that she "really did not want to do that." (*Id.* at 140:5–10.) Graves again said she would get back to her. (*Id.* at 140:12.)

In the meantime Thorpe consulted with Slater, who advised her "to move slowly" to "try to do what [she] could to make sure nobody got hurt." (Thorpe Dep. 140:16–23.) Thorpe understood Slater to be referring specifically to "not racing out" to get a "verbal order and placing the child." Rather, Thorpe said Slater advised her to "work with the systems that were involved as most efficiently and the best we could to try and make sure that the child's needs were met." (*Id.* at 141:8–15.) When asked what options she thought Thorpe had, Slater said "[t]o wait for Lynn's phone call." (*Id.* at 145:4.)

Graves called Thorpe back early that afternoon. Thorpe testified Graves told her to "call the Court," that "they were waiting for [Thorpe] to call," and gave her Magistrate Yoder's number. (Thorpe Dep. 145:13–21, 148:16–19.) Thorpe knew all dependency and neglect cases went to Magistrate Yoder and had obtained verbal orders for placement from him on an average of twice a month. (*Id.* at 149:11–150:5.) Thorpe testified that she had never before been denied a verbal order from Magistrate Yoder when she requested one. (*Id.* at 150:10–12.)

Without contacting Mueller or his office, Thorpe called Magistrate Yoder. She gave him Julie's name and birthdate in keeping with normal procedure when calling for a verbal pickup order, described the photos and told Magistrate Yoder that Malik had retained an attorney who wanted certain conditions placed on the interview. (Thorpe Dep. 153:9 – 154:14.) Significantly, Thorpe omitted several key facts, including (1) that the photographs had been taken five months before by a person presently living in New York (*id.* at 162:13–21, 162:24 –163:3); (2) that neither she nor the police department believed Julie to be in an emergency situation (159:1–4); (3) that Louise Malik had agreed voluntarily to an interview and had already been interviewed (163:4–12); (4) that Detective Coleman had cancelled the first scheduled interview with Julie because of a higher priority case (164:8–14); (5) that Mueller's conditions for the interview were based on the recommendations of Dr. Jens (170:6–9); or (6) that Bob Ledwith had examined the photos and did not believe that the photos depicted bruising on Julie. (*Id.* at 164:15–18.)

Thorpe testified she was "taken aback" and "shocked" when Magistrate Yoder issued the verbal pickup order, claiming she was only seeking guidance and clarification from the judge. (Thorpe Dep., 154:20–157:25.) Thorpe states she responded "Oh, do I have to?" when Magistrate Yoder issued the order (*see id.* at 154:21–22),[4] but admits she said nothing further.

Shortly after obtaining the order, and again without contacting Mueller's office, Thorpe called a family crisis center for Julie's placement. The intake staffmember noted on the center's telephone referral form that the call was received at 2:45 p.m. (Blum Dep., 16:20–25.) The staffmember recorded the following description of the case based on Thorpe's statements on the phone: "Uncle took porno pictures of girl. Photo company reported. Mom aware of pictures. Attorney blocking any interventions." (*Id.* at 16:14 – 17:12.)

At approximately 5 p.m. on January 24, 1994, Coleman and Thorpe, accompanied by Detective Anderson and police officer Mehl, went to the Malik home to execute the pickup order. (Coleman Dep. 180:15–23; Thorpe Dep. 197:5–11.) Coleman, Mehl and Thorpe were armed. (Coleman Dep. 183:110.) Finding no one home, they went to Aurora Community College to see if Malik was still at work. (Coleman Dep 181:4–15.) When she was not, they returned to Malik's home and waited. (*Id.* at 183:21–42.)

Malik and Julie eventually returned home. As Malik pulled the car into the garage, Coleman, Anderson, Mehl, and Thorpe entered the open door behind Malik's car. (Coleman Dep. 187:17–24.) For the first time Malik was told that Thorpe had sought and obtained a court order for Julie's seizure and placement. (*Id.* at 188:1–2; Defs.' Statement Undisputed Material Facts, ¶ 80.) In the words of Detective Anderson, Malik became upset. He said "there was panic in her face" and she began to tremble and cry. (Anderson Dep. [Ex 14, Pls.' Combined Resp.] 40:13–18.) Anderson said Coleman and Malik were talking back and forth very quickly, with Malik asking "Why are you doing this?" and Coleman saying "Because we need to interview the child" and Malik saying "But I don't understand, I've talked to you before." (*Id.* at 41:1–11, 44:12–17.) Anderson said he tried to "de-escalate" the situation by soothing Malik and asking her to get Julie out of the car. Malik did so, kissed Julie, and told her "You'll be okay." (*Id.* at 41:17–24.) Coleman took Julie and Thorpe told Malik about the hearing scheduled for the next day. Anderson said Malik regained some composure but was still "visibly shaken." (*Id.* at 42:2–9.) Julie was frightened and crying as Coleman took her to the police car. (*Id.* at 46:3–4, 47:10–20.)

Thorpe testified at her deposition that, as Coleman was walking away with Julie, one of the police officers told Malik, " 'This wouldn't have happened if you hadn't gotten an attorney.' " (Thorpe Dep. 213:2–19.) Thorpe said she tried to intervene because Malik was

---

4. I note that Magistrate Yoder had no recollection of this "at all" and testified he "would be surprised if [Thorpe] had said that" because it was contrary to "the tenor of the conversation." (Yoder Dep. [Ex. 12, Pls.' Combined Resp.] 78:21 – 79:5.)

"very distraught" and Thorpe "didn't feel it was an appropriate time to be talking to [Malik] about that." (*Id.*) No one told Malik where they were taking Julie. (Malik Dep. 113:8–9.)

Julie was transported to the family crisis center where Thorpe told the staff that, in accordance with Magistrate Yoder's order, Julie was not to be evaluated, interviewed or subjected to physical examination pending the outcome of the next day's hearing. (Statement of Undisputed Facts, ¶ 82.) Julie spent the night at the center and Malik spent the night alone at home.

The parties appeared before Magistrate Yoder the next morning. Malik was represented at the hearing by Mueller's associate, Saskia Jordan. The position of the Department of Social Services was presented by an assistant county attorney as follows:

> ... [T]he Department is seeking that the child remain in custody, that the Court enter their [sic] findings as to the reasonable efforts [sic]. As the Court is aware, when the Department sought this Order, the Department was not necessarily seeking an Order for the placement of the child. In speaking with the caseworker, it's my understanding that our position as to the child being placed is that it's necessary for the Department to first have access to the child. The Department has not been allowed to interview the child, and prior to placement of the child, the Department had not been allowed access to the child. Once the child has been interviewed, it may be appropriate for the child to be released from placement, for the Department to no longer be involved.

(Statement of Undisputed Facts, ¶ 83.) For his part, Magistrate Yoder clarified his understanding from the previous day as being that the "Department at that time was requesting temporary custody of the child" and that the Department was "requesting that [temporary custody] continue so that the interview and examination can take place." (*Id.*) The assistant county attorney agreed with this characterization. (*Id.*) This was the first time Malik understood the Department was not seeking custody of Julie except for the purposes of conducting an interview and physical examination.

Part way through the hearing, the parties reached an agreement concerning the conditions of the interview and examination and stipulated to the immediate return of Julie to her mother. The stipulated conditions were virtually identical to those originally requested by Mueller in his January 18 letter. With respect to videotaping, Magistrate Yoder referred to Colo.Rev.Stat. § 19–3–308.5 and ordered that the interview be conducted in accordance with the General Assembly's express "legislative preference for videotaping." (Statement of Undisputed Facts, ¶ 86.)

Neither the interview nor the physical examination produced any evidence that Julie had been the victim of sexual or physical abuse. Moreover, the physician who conducted the physical exam reviewed the photographs and concluded " '[b]ruising' appeared to be shadows within the photograph [and] [d]o not represent actual bruises." (CAPT Medical Evaluation, Ex. 15, Pls.' Combined Resp. Mots. Summ. J.)

The Maliks remained under the supervision of the court over the course of the next four months. A guardian *ad litem* was appointed and Malik and Julie had several sessions with Dr. Jens. Dr. Jens reported Julie raised none of the issues typically exhibited by sexually abused children during their sessions but described Julie as a "somewhat difficult" and "assertive child." (Letter from Jens to Mueller dated 4/10/94, Ex. 17, Pls.' Combined Resp.) Jens described Malik as having "excellent and much above average" parenting skills and stated Malik was "obviously able to seek help for her daughter as needed." (*Id.*) Jens found the involvement of Social Services to have been "very stressful" and saw "no need for further monitoring of this family." (*Id.*)

The guardian *ad litem* reported to the court that, while a member of the Department of Social Services' Sex Abuse Team "suspect[ed] [based on a drawing made by Julie] that [Julie] has been sexually abused or at the least exposed to graphic pornography or elements of both," she would recommend that Julie remain in the custody of her mother. (Report of Guardian, Ex. 16, Pls.'

Combined Resp.) Notwithstanding these concerns, the Department asked that the matter be closed and the case was taken off the court's juvenile docket on April 21, 1994. (Statement of Undisputed Facts, ¶ 88.) This action ensued.

## B. *Merits.*

The facts and evidence presented, viewed in the light most favorable to Malik, are more than sufficient to defeat Defendants' motions for summary judgment.

### 1. The Right to Counsel—Retaliation for having Obtained Counsel.

█ Plaintiffs contend Coleman and Thorpe violated 42 U.S.C. § 1983 by acting under color of state law to deprive them of their constitutional right to counsel under the First, Fifth and Sixth Amendments to the United States Constitution. Specifically, Plaintiffs contend Coleman and Thorpe sought and obtained the *ex parte* seizure order at least in part to retaliate against Malik for having retained counsel. Plaintiffs further contend that Coleman and Thorpe intended and conspired to interfere with Malik's relationship with Mueller by circumventing him to obtain the *ex parte* order from Magistrate Yoder.

It is Plaintiffs' rights under the First Amendment that form the basis of the Complaint and on which I will focus.[5] The controlling case in this circuit is *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir.1990), which held that "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." The constitutionally protected right at issue in *DeLoach*, as here, was plaintiff's First Amendment right of association and free speech.

In *DeLoach*, plaintiff filed a civil rights action alleging the investigating officer in a

murder case retaliated against her for hiring an attorney after she became a suspect. 922 F.2d at 620. The Tenth Circuit affirmed the judgment entered in plaintiff's favor on the jury's verdict, concluding there was sufficient evidence by which a reasonable jury could conclude that the officer had worked to cause the arrest of the plaintiff at least partly in retaliation for her decision to hire an attorney. *Id.* Specifically, the court found the officer's statements that the suspect was "not being very cooperative" after she hired an attorney and "[p]layback is hell, that's what you get for hiring a smart-ass lawyer" supported the jury's verdict, as did additional evidence that the officer had mischaracterized and concealed the exculpatory opinion of a key medical expert in the arrest affidavit. *Id.* The court also cited testimony from the assistant district attorney that, had the opinion of the expert been known before the arrest warrant was issued, she would not have been arrested. *Id.* at 623. Finally, the court noted several other facts the officer mischaracterized in the arrest affidavit regarding her report of initial interviews. *Id.* at 622.

The facts in the present case are analogous. Viewed in the light most favorable to Malik, they establish that Defendants, particularly Detective Coleman, deliberately worked to circumvent Malik's counsel and the conditions he sought on the interview based on the psychologist's recommendations in an effort to force the interview without such conditions. Coleman contacted Malik directly to "bully" her into rescheduling the interview without consulting with counsel knowing she was represented by an attorney and after having spoken with the attorney and having been told that contact should be through him. Both Defendants misrepresented Mueller's and Malik's conduct to the county attorney's office, the magistrate judge

---

5. The parties' arguments regarding Malik's rights or lack of rights under the Sixth and Fifth Amendments to the United States Constitution are rejected as wholly and completely irrelevant to the facts of this case. There were no charges filed in this case and no "confession" or self-incrimination sought to be used against Malik or suppressed by her. I take issue, however, with Defendants' glib assertion with respect to Malik's

Sixth Amendment claim that no right to counsel ever attached because no charges were ever filed. Given that Coleman advised Malik of her right to counsel both verbally and in writing when Malik had come in for initial questioning and that, at the time, Malik was considered a suspect and could well have been charged, the assertion is both offensive and erroneous.

and the family crisis center, falsely stating that Mueller and Malik were "refusing," "denying" or "blocking" access to Julie. In fact, Mueller and Malik had expressed nothing but a desire to cooperate and produce Julie for an interview, but under certain conditions that comported with the law and the recommendations of Jens.

In her *ex parte* request for a temporary custody order, Thorpe failed to mention that the Department's own expert believed the darkened spots on the torso pictures were shadows, rather than bruises, and failed to mention that the pictures were taken months before by an individual who lived in New York and posed no immediate danger to Julie. Contrary to Thorpe's assertions later, Magistrate Yoder denied Thorpe acted as though she did not want Julie taken into the Department's custody and testified that, "[i]f she had indicated to me that she did not want this to occur ... I think I would have questioned her further." (Yoder Dep., 79:1–5.)

Finally, and although not uttered by either Defendant directly, an officer familiar with the case only through his contact with Defendants was said to have told Malik Julie would not have been taken "if [she] hadn't gotten an attorney."

The facts Malik has asserted in support of her claim that Defendants interfered with, and retaliated against her for exercising, her constitutionally protected First Amendment rights are more than adequate to survive summary judgment under *DeLoach*. Defendants are not entitled to qualified immunity because *DeLoach*, decided three years before the acts in question, was clearly established law in January 1994. Defendants have offered no evidence to support an assertion that reasonable officers in their position would not have known that their acts violated the law and certainly none that would entitle them to summary judgment on that basis. Malik has met her burden on summary judgment of establishing that Defendants violated her rights under clearly established law. Defendants' request for summary judgment on Malik's First Amendment retaliation claim is denied.

### 2. The Substantive Due Process Right to Familial Association and Privacy.

Malik claims the conduct of Defendants Coleman and Thorpe in obtaining and executing the placement order violated her right to familial integrity and privacy. The clearly established law at the time of the alleged incident was that parents have a fundamental liberty interest in the "care, custody and management" of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Spielman*, 873 F.2d at 1383. The Fourteenth Amendment protects this liberty interest, which, absent extraordinary circumstances, may not be infringed upon or denied without providing a fair procedure for the deprivation.

Thus, at the time of Defendants' actions in January 1994, Louise Malik had a constitutionally protected liberty interest in the custody of Julie. Removal of Julie from the custody of her mother required predeprivation notice and a hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Spielman*, 873 F.2d at 1385 (citing *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 848, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14 (1977)); *Snell v. Tunnell*, 920 F.2d 673, 697 (10th Cir.1990). *See also Hollingsworth*, 110 F.3d at 739 ("in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or a court order").

In Colorado, these competing interests are balanced in Article 3 of the Children's Code, Colo.Rev.Stat. §§ 19–3–100.5 to 19–3.5–108 (1997). The Code allows for the placement of a child into temporary custody with or without a court order, but requires notice to the child's parent or guardian that the child has been placed and that the parent or guardian has the right to a prompt hearing. Colo.Rev.Stat. §§ 19–3–401 to 405. *See W.H. v. Juvenile Court*, 735 P.2d 191, 193 (Colo.1987)(applying former, similar provisions). Placement by verbal or written order may be requested by county departments of

social services, law enforcement officers, hospital administrators, or physicians "if such person or department believes that the circumstances or conditions of the child are such that continuing the child's place of residence or in the care and custody of the person responsible for the child's care and custody would present a danger to that child's life or health in the reasonably foreseeable future." Colo.Rev.Stat. § 19–3–405(2)(a). Reasonable efforts must be made to prevent unnecessary out-of-home placement unless the evidence supports a finding that the child is "seriously endangered and an emergency situation exists which makes it reasonable not to make reasonable efforts to prevent the removal." *Id.* § 19–3–403(3.6).

Viewed in the light most favorable to Malik, the evidence in this case is sufficient to warrant a finding that Defendants' conduct in seeking and obtaining the *ex parte* placement order violated Malik's constitutionally protected liberty interest in the custody of Julie. Defendants acknowledged Julie was in no imminent danger at the time they sought the order and the facts suggest it was secured only through distortion, misrepresentation and omission. Defendants knew Mueller and Malik had agreed to make Julie available for an interview. They knew the pictures had been taken months before by an uncle who did not live in the state. They knew Bob Ledwith, a Department expert whose opinion Thorpe trusted, did not believe the shadows on the torso pictures to have been bruising. Defendants knew Malik was represented by counsel and knew, or should have known, that the conditions he sought for the interview were not unreasonable and, in the case of the request for videotaping, were "strongly encouraged" and codified as such by the General Assembly. *See* Colo.Rev.Stat. § 19–3–308.5(1)(a).

Nevertheless, Defendants withheld this information and told their colleagues, the Assistant County Attorney, Magistrate Judge Yoder, and the family crisis center intake officer that Julie was in immediate danger and that they were being "denied access" to her. A reasonable inference from the facts presented is that this was not an "extraordinary situation" as would justify the taking of Julie before notice to her mother and an opportunity for her to be heard.

As for the defense of qualified immunity, Defendants' fraud and omission belies any assertion, essential to the defense, that they acted reasonably. Certainly it precludes entry of summary judgment in their favor on the issue. Accordingly, Defendants' Motions for Summary Judgment are also denied as they apply to Malik's claim for violation of her substantive due process right to familial association and integrity.

### 3. The Right to be Free From Unreasonable Searches and Seizures.

■ Malik also claims a violation of her Fourth Amendment rights by virtue of Defendants' fraud and deception in securing the placement order from Magistrate Yoder. Malik relies by analogy on *Bruning v. Pixler,* 949 F.2d 352, 356 (10th Cir.1991), which held in the context of arrest warrants that, "to knowingly or recklessly omit from the arrest affidavit information which, if included, would vitiate probable cause," constitutes a violation of a plaintiff's Fourth and Fourteenth Amendment right to be free from unreasonable seizures.

Again I find the Tenth Circuit's decision in *Snell v. Tunnell* addresses the issue raised. In *Snell,* plaintiffs relied on the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution to assert claims against various social workers and general counsel for the Oklahoma Department of Social Services. Plaintiffs were foster parents with a long history of problems with the department. Plaintiffs claimed defendants interfered with their reasonable expectation of privacy when they entered plaintiffs' home on the authority of an order procured with allegations known to be false and in retaliation against plaintiffs' outspoken nature and refusal to be intimidated by department pressure. 920 F.2d at 697.

In *Snell,* the Tenth Circuit observed that the touchstone of the Fourth Amendment is reasonableness. 920 F.2d at 697. Invoking the Eighth Circuit's standard for liability where a social worker engages in judicial deception, the Tenth Circuit found the evidence sufficient to indicate that defendants'

engaged in a deliberate course of conduct, "complete with false information," designed to gain entry into plaintiffs' home and which defeated a finding of objective reasonableness. *Id.* at 698. Because the information was essential in persuading the juvenile judge to issue the placement order at issue, the Tenth Circuit found plaintiffs had established a violation of the Fourth Amendment sufficient to withstand summary judgment. *Id.* at 698–99.

In determining whether the law was clearly established at the time of the conduct in question, the Court in *Snell* looked to *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). The Tenth Circuit analogized the information upon which a social worker proceeds to obtain orders for placement or entry to the standards for probable cause for a warrant articulated in *Franks. See also DeLoach*, 922 F.2d at 621–22. While probable cause may be founded upon hearsay or information within the applicant's own knowledge that may have been garnered hastily, implicit in the *Franks* concept of reasonableness under the Fourth Amendment "is that the information on which the social worker proceeds ... is not known to be false ." *Snell*, 920 F.2d at 699.

The *Franks* rule applies to omissions as well as affirmative misstatements, if the magistrate or judge was misled by them. *DeLoach*, 922 F.2d at 621–22. Recklessness may be inferred from omission of facts that were "clearly critical" to the issuance of the warrant or order at issue. *Id.* at 622. Thus, in *Snell*, evidence tending to show that a social worker acted deliberately or with reckless disregard for the truth in obtaining an entry and placement order based on allegations of child pornography and prostitution was held to defeat the social workers' motion for summary judgment based on qualified immunity. So, too, did evidence tending to show that the defendant police detective in *DeLoach* made intentional or reckless misstatements to the judge defeat her motion for summary judgment based on qualified immunity.

The facts in the instant case are sufficient to establish claims against both Coleman and Thorpe for deprivation of Malik's reasonable expectation of privacy in her home and in the custody of her daughter under the Fourth Amendment. The law as set forth in *Snell* and *DeLoach* was clearly established in 1994, and Defendants' motions for summary judgment are denied as to Malik's Fourth Amendment claim as well.

### C. Plaintiffs' Conspiracy Claim.

Defendants did not challenge the merits of Plaintiffs' claim for conspiracy to violate civil rights under 42 U.S.C. § 1985 in their original Motions for Summary Judgment. The Magistrate Judge addressed the claim and recommended that it be dismissed based on his conclusion that the underlying civil rights claims would not survive summary judgment. Because I find this conclusion to have been erroneous, I decline to dismiss the conspiracy claim.

### D. Plaintiffs' State Law Claim for Outrageous Conduct.

The relative merits of Plaintiffs' state law claim for outrageous conduct were barely touched upon by the parties in their briefs. Defendant Coleman averred generally that the claim was subject to dismissal under the Colorado Governmental Immunity Act (Mem. Supp. Coleman's Mot. Dismiss and Mot. Summ.J. at 22), to which Malik did not respond. The Magistrate Judge addressed the claim only in the context of recommending I decline to exercise supplemental jurisdiction given his conclusion that Defendants were entitled to summary judgment on Malik's federal claims. The briefs, which were focused almost entirely on Malik's civil rights claims, are inadequate to address the outrageous conduct claim and I decline to do so. I will however, exercise jurisdiction over it.

### IV. CONCLUSION.

Based on the foregoing findings and conclusions, IT IS ORDERED that the stipulated motion to dismiss Defendant City of Aurora is GRANTED *nunc pro tunc* to October 22, 1996. The stipulated motion to dismiss Defendant Aurora Department of Social Services is GRANTED *nunc pro tunc* to January 17, 1997, subject to the Department's reservation of rights to seek attorney

fees and costs within 45 days after entry of final judgment in this case.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Dismissal Pursuant to Fed.R.Civ.P. 41(a)(2) of the Third, Fourth, Fifth, Sixth, and Seventh Claims for Relief is GRANTED subject to Defendant Thorpe's reservation of rights to seek her attorney fees and costs attributable to the defense of these state law claims. Thorpe shall file any request for fees within 45 days after entry of final judgment in this case. Defendant Coleman's Motion for Attorney Fees shall be HELD IN ABEYANCE pending disposition of Plaintiffs' federal claims for relief. Finally,

IT IS ORDERED that the Motion of Defendant Thorpe for Summary Judgment, together with the Combined Motion of Defendant Coleman to Dismiss State Law Claims and Motion for Summary Judgment as to Civil Rights Claims, are both DENIED. Counsel for Plaintiffs, after conferring with counsel for the respective Defendants, shall contact chambers within 20 days of the date of this Order to schedule a status conference.