**F I L E D**
United States Court of Appeals
Tenth Circuit

SEP 14 1999

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

LOUISE MALIK, individually and as
mother and natural guardian of her
daughter; JULIE MALIK, a minor,

 Plaintiffs - Appellees,

v.

ARAPAHOE COUNTY
DEPARTMENT OF SOCIAL
SERVICES, an agency for the County
of Arapahoe; COLORADO
DEPARTMENT OF SOCIAL
SERVICES, an agency of the State of
Colorado; AURORA POLICE
DEPARTMENT, an agency of the
government of the City of Aurora;
AURORA, CITY OF,

 Defendants,

and

ROBERTA D. COLEMAN and
MYRLENE C. THORPE,

 Defendants - Appellants.

Nos. 97-1476 and 97-1477

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 95-K-144)**

---

Edward M. Caswall of Alperstein & Covell, P.C., Denver, Colorado and Robert Stephan Hall (Marc F. Colin with him on the briefs), of Bruno, Bruno and Colin, P.C., Denver, Colorado, for the Appellant.

Daniel M. Reilly (Robert C. Brown and Ann C. Kiley with him on the briefs), of McKenna & Cuneo, L.L.P., Denver, Colorado, for the Appellee

---

Before **EBEL**, **MAGILL**[*] and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Defendants Roberta Coleman and Myrlene Thorpe appeal the district court's denial of summary judgment in this civil rights action. The district court denied summary judgment for Coleman on her claims of absolute and qualified immunity, and denied summary judgment for Thorpe on her claims of qualified immunity, finding sufficient disputed facts to support a conclusion that Coleman's actions were outside the scope of absolute immunity, and that both defendants' actions violated clearly established law. Appellants contest these conclusions, as well as other decisions by the district court regarding state law claims, conspiracy, hearsay evidence, and attorneys fees. The case requires us to consider to what extent the reviewability doctrine enunciated in Behrens v. Pelletier, 516 U.S. 299, 313 (1996), and Johnson v. Jones, 515 U.S. 304, 317 (1995), and the

---

[*]The Honorable Frank J. Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

pendent appellate jurisdiction doctrine permit us to review appellants' various claims. We affirm the district court's denial of summary judgment based on claims of absolute and qualified immunity, as well as its reinstatement of plaintiffs' conspiracy claim, and dismiss the remainder of appellants' claims for lack of jurisdiction .

## I

On January 6, 1994, Inspector Pat Carr, a Denver-based enforcement officer for the United States Postal Inspector, contacted the Aurora, Colorado Police Department concerning ten photographs of a partially clothed young female child, some with full frontal genital exposure. The pictures had been forwarded to Carr's office from a Texas photo processing plant by the Dallas Police Department, and had originally been sent for processing from an Aurora address. Inspector Carr and defendant Roberta Coleman, an officer with the Aurora Police Department, began an investigation into the photos as potential violations of child pornography laws. Of particular concern to both officers was an area of the child's torso that appeared in some photos to indicate that the child's body was bruised.

Coleman learned that the person who sent the photos for processing was appellee Louise Malik, an Aurora resident who had a four-year-old daughter named Julie. On January 11, 1994, Coleman called Malik and, without being

informed of the subject of the investigation, Malik agreed to drive to the police station for an interview.  Soon after Malik arrived, Coleman advised her of her Miranda rights both verbally and in writing, and Malik acknowledged and signed a written advisement without requesting counsel.  Coleman then told Malik the reason for the police's concern and showed her the photographs of Julie.

Malik informed the officers that the photos had been taken five months earlier by her brother Jim Maszle, a New York-based artist.  Maszle had visited Malik in August 1993, two months after the death of Malik's husband (and Julie's father) in a car accident.  During his visit, Maszle took approximately ten rolls of innocuous photographs of various subjects, including his family and friends.  Maszle had also taken the photographs of Julie that had become the subject of Coleman and Carr's investigation.  Months after Maszle's visit, Malik sent the film to a processing plant in Texas for developing.

Carr informed Malik that sending or receiving through the mail photographs depicting child genitalia was a felony.  Malik denied that the photographs were pornographic; rather, she characterized them as artistic and denied that the shaded areas on Julie's torso in the photographs were the result of bruising.  Malik claims that as the questioning continued, she stated multiple times that she felt she needed a lawyer present.  Coleman allegedly told Malik that she didn't need a lawyer, and that "if you can just give us reasonable

explanations, this will probably all go away." Appellee's Supp. App. at 55. At the end of the interview, Coleman told Malik that her statement would be presented to the District Attorney, who would decide whether to proceed further in the investigation of the photos.

Pursuant to Coleman's request during the interview, Malik contacted Maszle that evening and requested that he call the Aurora Police Department. During a January 13 interview with Coleman, Maszle was read Miranda warnings and admitted taking the photos of his niece, although he denied having any prurient interest in taking them.

Coleman called Malik on January 14, and they scheduled an interview with Julie on January 19. Concerned about both the threat of prosecution and the imminent questioning of her daughter, Malik retained attorney Norman Mueller on January 17 to represent her. The next day, Mueller contacted Coleman, at which time Coleman informed the attorney that she would have to cancel the January 19 interview because of another investigation. Coleman insisted that Julie be made available for an interview, and allegedly told Mueller that if he did not cooperate, she would get a court order to gain access to the child. Although Mueller alleges that he and Coleman discussed both a date and a set of procedures and conditions for such an interview, Coleman concluded from the conversation that Mueller was not going to allow Julie to be interviewed.

Coleman called Malik directly on January 19 to reschedule the interview with Julie, even though she now knew Malik was represented by counsel. When Malik informed Coleman that she had retained a lawyer, Malik claims that Coleman told her, "this has nothing to do with your attorney . . . this has to do with Julie." Appellant's Supp. App. at 130. Coleman dismissed Malik's requests that the interview be recorded. Malik alleges that Coleman aggressively attempted to schedule the interview during the call, and that she felt trapped into agreeing to reschedule the interview for January 21.

The next day, January 20, Mueller faxed a letter to Coleman protesting the officer's direct contact with Malik, and reasserting his client's conditions for an interview with Julie. Specifically, he demanded that the police videotape the interview and that Malik be in attendance during the questioning. He also requested that Dr. Kathryn Jens, a child psychologist, screen the questions to be posed to Julie before the interview and attend the interview itself. Finally, because of his and Dr. Jens's unavailability on January 21, Mueller rejected the interview date Coleman had scheduled with Malik and proposed as alternatives either Friday, January 28, or the week of Monday, January 31. Coleman claims not to have read the letter until the afternoon of January 21.

Coleman and defendant Myrlene Thorpe, a caseworker with Arapahoe County Department of Social Services ("ACDSS") who had been assigned to the

Julie Malik case, met that same day with Bob Ledwith, a physician's assistant on contract with ACDSS, who told Coleman and Thorpe that he did not believe the darkened spots on Julie's torso in the photos "necessarily represented bruising," and recommended that the pictures be shown to an expert. Appellees' Supp. App. at 106. During that same meeting, Coleman and Thorpe discussed the scheduling of the interview with Julie, and specifically considered a court order "of some sort" because Mueller "was not going to allow me to have access to Julie." Appellees' Supp. App. at 28. Coleman's handwritten notes concerning the meeting include the statement "Draw it up, court order, Monday, court Tuesday," with an accompanying bracketed phrase "(Plan of action)." Appellees' Supp. App. at 27. In her deposition, Coleman described the "plan" as a collaborative effort by Coleman, Thorpe, the Aurora Police Department, and the ACDSS to obtain a court order "[i]f Mr. Mueller and Mrs. Malik did not show up for appointments or provide Julie for our interview." Appellants' Supp. App. at 29.

On Friday, January 21, Coleman discussed Julie's case and Mueller's January 20 letter with Thorpe. Both agreed that the conditions Mueller demanded were "generally unacceptable" to them. Appellee's Supp. App. at 107. After her conversation with Coleman, Thorpe immediately called Mueller. Mueller and Thorpe vehemently disagree about the tone and content of their conversation. Whereas Mueller described Thorpe as "friendly" and "congenial" and concluded

that Thorpe viewed the case as "no big deal," Appellants' Supp. App. at 84, Thorpe characterized Mueller as argumentative and "fairly accusatory" in his insistence about the legal requirements for interviewing Julie, Appellees' Supp. App. at 109.

After her conversation with Mueller, Thorpe called Lynne Graves of the County Attorney's office to discuss Julie's case, as well as what she characterized in her deposition as "the problem [Thorpe] was having with the attorney allowing the interview." Appellants' Supp. App. at 186. Other than informing Graves of Mueller's specific request that the police videotape the interview, Thorpe neither described Mueller's other interview conditions to Graves, nor sent her Mueller's fax outlining and supporting his client's position. Early on the following Monday, January 24, Thorpe called Graves again, and learned that Graves had neither called Mueller nor researched the videotaping issue. After inquiring about alternatives to "getting a verbal order and picking up the child" for the interview, which she said she "really did not want to do," Thorpe asked Graves for advice about how else to proceed. Appellants' Supp. App. at 189. Graves again said she would call Thorpe when she had more information. While awaiting Graves's return call, Thorpe spoke with her supervisor JoAnne Slater, who advised Thorpe to "move slowly, carefully, try to do what [she] could to make sure nobody got hurt." Id.

Graves called Thorpe that afternoon and told the officer to call Magistrate Bradley J. Yoder, who handled all of the ACDSS's dependency and neglect cases. Thorpe had previously contacted Magistrate Yoder regularly concerning other cases, and had never failed to receive a verbal order from him allowing her to pick up a child. Thorpe then called Magistrate Yoder, told him Julie's name and birthdate, and proceeded to describe the photographs and the suspicions she and Coleman shared about the signs of bruising on the child's torso. Although she had not explicitly requested a verbal placement order from the magistrate, this information was the type Thorpe usually provided to Magistrate Yoder when she had previously called him seeking such a verbal order. Thorpe also informed the magistrate that Julie's mother had retained an attorney who was requiring certain conditions before he would agree to allow the child to be interviewed, that ACDSS "believed it could not wait any longer to act on the matter," and that Thorpe "was not certain what was going on in the mother's household, whether the child might be subject to abuse, [or] whether the mother was covering for someone else." Appellants' Supp. App. at 216.

As the district court noted, however, Thorpe apparently failed to inform Magistrate Yoder of a number of crucial facts: that the photographs were five months old and had been taken by an uncle who did not live in the same city as the child; that the authorities did not consider the child to be in imminent danger;

that the mother had already been interviewed voluntarily; that Officer Coleman herself had canceled one of the previously scheduled interviews; and that one member of ACDSS had been skeptical of Coleman and Thorpe's suspicions that the photos indicated bruising on Julie's body. See Malik v. Arapahoe County Dep't of Soc. Serv., 987 F.Supp. 868, 878 (D. Colo. 1997).

In response to Thorpe's description of Julie's case and of the photos, Magistrate Yoder entered an order placing custody of Julie in the ACDSS and directed Thorpe to have the child picked up. Thorpe claims to have been taken aback by the magistrate's granting an order for which she did not intend to ask, and claims that she responded by inquiring, "Do I have to?" Appellants' Supp. App. at 193. In his deposition, however, Magistrate Yoder testified that Thorpe's description did not match "the tenor of the conversation" as he recalled it. Appellants' Supp. App. at 223. If Thorpe had seemed shocked at being granted the order and had challenged his implicit conclusion that such an order was appropriate, Yoder testified, he would have questioned her further about the case and what the officer wanted from him.

Although Thorpe, Coleman, and Slater claim they were surprised by the magistrate's issuance of the order, they did not hesitate to carry it out. Late that afternoon, Thorpe, Coleman, a second detective, and one uniformed police officer executed the order at Malik's home. Thorpe testified that as they took Julie to the

police car against Malik's will, the uniformed officer told Malik, "This wouldn't have happened if you hadn't gotten an attorney." Appellants' Supp. App. at 201. In his own deposition, the officer who was present, Charles Mehl, denied having made any such statement.[1]

Julie was transported to a family crisis safehouse, where she stayed the night. Pursuant to Magistrate Yoder's order, Julie was not evaluated, interviewed, or subjected to a physical examination pending a hearing in his court the next day.

At the beginning of that hearing, an assistant county attorney explained the position of ACDSS:

> [T]he Department is seeking that the child remain in custody, that the Court enter their findings as to the reasonable efforts [sic]. As the Court is aware, when the Department sought this Order, the Department was not necessarily seeking an Order for the placement of the child. In speaking with the caseworker, it's my understanding that our position as to the child being placed is that it's necessary for the Department to first have access to the child. The Department has not been allowed to interview the child, and prior to placement of the child, the Department had not been allowed access to the child. Once the child has been interviewed, it may be appropriate for the child to be released from placement, for the Department to no longer be involved.

---

[1]Appellants argue that this alleged statement is inadmissible hearsay. For reasons discussed in Section IV, infra, we have no jurisdiction to review this claim at this juncture.

- 11 -

Appellants' Supp. App. at 17. Magistrate Yoder then explained that from his conversation the previous day with Thorpe, he understood that the ACDSS "was requesting temporary custody of the child," and that at the hearing, the Department was "requesting that [temporary custody] continue so that the interview and examination can take place." Id. at 17-18. The assistant county attorney agreed with the magistrate's characterization of ACDSS's position.

Later in the hearing, the parties agreed to a stipulation that custody of Julie be returned to her mother, and that Julie undergo a physical examination and verbal interview that same day. The magistrate found that prevailing state law expresses a strong preference for the videotaping of interviews with a child suspected of being a sexual abuse victim, so long as the investigating agency determines that such taping is not impracticable under the circumstances and would not result in trauma to the child. See Colo. Rev. Stat. § 19-3-308.5. The interview, which took place the evening after the hearing, was unproductive, and Julie returned home with her mother. Julie was given a physical examination on January 26, at which the examining physician found no signs of abuse, and concluded that the "bruising" in the photographs was caused by shadows. Although the Maliks remained under court supervision for the next four months and a guardian ad litem was appointed, no charges were ever filed. Upon request

of the ACDSS, the case was taken off the court's juvenile docket on April 21, 1994.

Malik made numerous claims for damages under 42 U.S.C. § 1983 in her original complaint, which also named the City of Aurora and the ACDSS as defendants. All defendants filed motions for summary judgment claiming immunity.[2] The district court concluded that Coleman did not have absolute immunity, and that Malik had established sufficient material facts to survive summary judgment on her claims of deprivation of rights to familial association, privacy, counsel, freedom from unlawful searches and seizure, and due process; conspiracy to deprive her of these rights; and outrageous conduct.[3] See Malik, 987 F.Supp. at 872, 880-83.

Coleman and Thorpe filed an interlocutory appeal of the district court's denial of their summary judgment motions. Our jurisdiction to consider Officer Coleman's appeal of the court's denial of her absolute immunity defense is not in doubt. See Nixon v. Fitzgerald, 457 U.S. 731, 742 (1982); Valdez v. City and County of Denver, 878 F.2d 1285, 1287 (10th Cir. 1989). Appellants also assert

---

[2]The claims against the city and county were voluntarily withdrawn by plaintiffs with prejudice, leaving only Coleman and Thorpe as defendants.

[3]Plaintiffs-appellees originally included other state law claims, which were voluntarily withdrawn and are not before us. Appellants challenge the district court's ruling on the outrageous conduct claim; as discussed in Section IV, infra, however, we lack jurisdiction to consider this challenge.

that we have jurisdiction to consider the district court's decision denying their qualified immunity defenses and upholding Malik's conspiracy claim, as well as hearsay evidence and attorney fees issues. We consider these claims.

## II

We review the district court's denial of Officer Coleman's absolute immunity claim de novo. See Kamplain v. Curry County Bd. Of Comm'rs, 159 F.3d 1248, 1250 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In ruling on Officer Coleman's motion for summary judgment on the grounds of absolute immunity for her conduct in obtaining and executing Magistrate Yoder's order to seize Julie from her mother, the district court found that, viewing the evidence in the light most favorable to appellees, Coleman assisted Thorpe in misleading the magistrate judge into issuing the ex parte seizure order despite knowing Julie was in no imminent danger, and that Coleman did so for the purpose of retaliating against Malik for exercising her constitutional rights. See Malik, 987 F. Supp. at 872. On appeal, Coleman argues that in seizing Julie, she was merely carrying out the ministerial functions of a

police officer executing a judge's order.  See Valdez, 878 F.2d at 1289-90 (holding that law enforcement officials enjoy absolute immunity from suit for performing ministerial actions under the direction of a state court judge).  She claims that no competent evidence in the record allows the inference the district court drew in finding that Coleman played a role in Thorpe's phone conversation with Magistrate Yoder leading to the magistrate's issuance of the ex parte order.

In determining whether particular acts of government officials are eligible for absolute immunity, we apply a "functional approach . . . which looks to the nature of the function performed, not the identity of the actor who performed it." Buckley v. Fitzsimmons 509 U.S. 259, 269 (1993) (internal quotations and citations omitted).  "The more distant a function is from the judicial process, the less likely absolute immunity will attach." Snell v. Tunnell, 920 F.2d 673, 687 (10th Cir. 1990).  In Snell, we held that social workers serving investigative functions in child abuse cases are analogous to law enforcement officers seeking an arrest warrant, who are entitled only to qualified immunity.  See id. at 691; see also Malley v. Briggs, 475 U.S. 335, 340-41 (1986) (refusing to grant absolute immunity to police officers performing the function of seeking an arrest warrant).

Although some of the facts admitted by Malik in the statement of undisputed material facts presented to the district court for purposes of summary judgment minimize the extent of Coleman's involvement in Thorpe's call to

Magistrate Yoder, the evidence of Coleman's discussions with Thorpe prior to the phone conversation with the magistrate, as well as depositions that describe Coleman and Thorpe's collaborative work in creating a "plan of action," create a genuine issue of material fact concerning Coleman's participation in the procurement of the order. Therefore, Coleman's alleged actions include participation in the investigative act of seeking a placement order, and therefore fall outside the sphere of actions protected by absolute immunity. See Snell, 920 F.2d at 691-92.

**III**

The defense of qualified immunity protects government officials from individual liability under 42 U.S.C. § 1983 for actions taken while performing discretionary functions, unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "When a defendant pleads qualified immunity, the plaintiff has the heavy burden of establishing: (1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions." Greene v. Barrett, 174 F.3d 1136, 1142 (10th Cir. 1999).

We have jurisdiction over this part of the officers' appeal if the district court's denial of their qualified immunity defense was based upon an abstract

issue of law—in this instance, whether the rights alleged by appellees were clearly established at the time of the alleged violations. See Behrens v. Pelletier, 516 U.S. 299, 313 (1996). We have no jurisdiction to review, as a final judgment, that portion of a district court's order resolving only questions of "evidence sufficiency." Johnson v. Jones, 515 U.S. 304, 313 (1995). Following Behrens, we have attempted to clarify the extent of our jurisdiction over the type of interlocutory appeal presented:

> A determination that the law allegedly violated by the defendant was clearly established at the time of the challenged actions is an abstract issue of law that is immediately appealable. A determination that under either party's version of the facts the defendant violated clearly established law is also immediately appealable. However, government officials cannot appeal pretrial denial of qualified immunity to the extent the district court's order decides nothing more than whether the evidence could support a finding that particular conduct occurred. An order denying qualified immunity on summary judgment is not appealable if it merely determines the facts asserted by the plaintiff are sufficiently supported by evidence in the record to survive summary judgment.

Foote v. Spiegel, 118 F.3d 1416, 1422 (10th Cir. 1997) (internal citations omitted); see also Armijo v. Wagon Mound Public School Board, 159 F.3d 1253, 1259 (10th Cir. 1998) (holding that we have jurisdiction only over the legal issues raised in case, not over the district court's factual findings). Because the district court in this case made specific factual findings and concluded that genuine issues of material fact existed, our duty is to review only whether Coleman and Thorpe's

conduct, as alleged by Malik, violated clearly established law.  See Clanton v. Cooper, 129 F.3d 1147, 1153 (10th Cir. 1997).

The district court found, and we agree, that the law at the time of the alleged constitutional violations was clearly established.  First, with respect to Malik's claim that her constitutional rights were violated by the appellants' alleged retaliation against her for having obtained counsel, we held in DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990), that an individual's First Amendment rights of association and free speech are violated when a police officer retaliates against her for retaining an attorney.

Second, the district court found, and we agree, that it was clearly established law that, except in extraordinary circumstances, a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures.  See Santosky v. Kramer, 455 U.S. 745, 753-54 (1982); Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989) (holding removal of children from parental custody requires predeprivation notice and a hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").  An ex parte hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard.  Cf. Spielman, 873 F.2d at 1385.  Colorado law balances a parent's liberty interest with the valid governmental interests in

preventing abuse by mandating that county departments of social services and law enforcement officers may seek temporary protective custody orders only "if such person or department believes that the circumstances or conditions of the child are such that continuing the child's place of residence or in the care and custody of the person responsible for the child's care and custody would present a danger to that child's life or health in the reasonably foreseeable future." Colo. Rev. Stat. § 19-3-405(2)(a).[4] The facts as found by the district court on summary judgment support a conclusion that defendants did not believe that the child faced such danger to warrant seeking temporary protective custody in an ex parte proceeding. Officials' desire to circumvent an attorney's attempt to negotiate protective conditions for an interview does not rise to the level of an extraordinary circumstance dangerous to the child, and does not allow deprivation of a parent's rights without notice and an opportunity to be heard.[5]

---

[4] We note that, relying largely on Santosky and Spielman, both of which were decided well before the actions alleged in this case, we held in Hollingsworth v. Hill, 110 F.3d 733, 739-40 (10th Cir. 1997), that deprivation of a parent's interest in care and custody of a child without notice and hearing, in violation of state custody law, violated law clearly established in January 1993.

[5] Our conclusion that disputed facts as viewed by the district court in the light most favorable to plaintiffs-appellees support a conclusion that defendants violated clearly established law by no means restricts the authority of law enforcement and child protective officers to seek protective custody of a child when they have legitimate concerns for the child's safety. Rather, our conclusion hinges upon the district court's finding that "[d]efendants acknowledged Julie was in no imminent danger at the time they sought the order and the facts suggest it was secured only through distortion,

(continued...)

- 19 -

The district court found, and we agree, that it was clearly established law that government officials' procurement "through distortion, misrepresentation and omission," Malik , 987 F. Supp. at 882 , of a court order to seize a child is a violation of the Fourth Amendment. See Snell, 920 F.2d at 697-99.[6] The fact that the order was allegedly obtained by omissions, rather than affirmative misstatements, is irrelevant, so long as the "omissions are so probative they would vitiate probable cause." DeLoach, 922 F.2d at 622.

Therefore, we conclude that the district court did not err in determining that the facts, viewed in the light most favorable to plaintiffs, make out violations of the law clearly established by DeLoach, Santosky, Spielman, and Snell. Officials cannot reasonably assume that the law permits them to obtain a custody order in

_____

[5](...continued)
misrepresentation and omission." Malik, 987 F. Supp. at 882.

[6]Appellants argue that Malik has neither a cause of action under 42 U.S.C. § 1983 for violations of her daughter's constitutional rights, nor a protected interest under the Fourth Amendment in custody of her daughter, and that therefore she cannot state a Fourth Amendment claim under § 1983. The child herself, however, has standing under the Fourteenth Amendment "to assert a claim that would, if she were successful, result in full compensation for any harm suffered." J.B. v. Washington County, 127 F.3d 919, 928 (10th Cir. 1997). In addition, "parents may assert their children's Fourth Amendment rights on behalf of their children." Hollingsworth v. Hill, 110 F.3d 733, 738 (10th Cir. 1997).

retaliation for a parent's retaining counsel and through reckless omission of probative facts to a magistrate.[7]

## IV

We may consider Coleman and Thorpe's appeal of their other claims that the district court erred in denying their summary judgment motion and in holding Coleman's motion for attorney fees in abeyance if we find that these issues are "inextricably intertwined" with Coleman's appeal of the absolute immunity issue and those parts of their appeal of the qualified immunity issue for which we have jurisdiction, and if we choose to exercise pendant appellate jurisdiction. Swint v. Chambers County Comm'n, 514 U.S. 35, 50-51 (1995). We have explained that the term "inextricably intertwined" refers only to cases in which "the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." Moore v. City of Wynnewood, 57 F.3d 924, 930 (10th Cir. 1995).

---

[7] In their briefs, appellants also contest the district court's application of disputed and undisputed facts to this clearly established law. Because "we must scrupulously avoid second-guessing the district court's determinations regarding whether [plaintiffs] ha[ve] presented evidence sufficient to survive summary judgment," however, we do not have jurisdiction to consider their arguments as an abstract issue of law under Behrens. Clanton, 129 F.3d at 1153. Instead, we conclude that the facts as determined by the district court are sufficient to demonstrate that appellants violated the clearly established rights of appellees as to all of appellees' constitutional claims.

Although in Moore we exercised pendent appellate jurisdiction, we also reiterated the Supreme Court's explicit limitations on the use of that discretionary doctrine. "The rule announced in Swint is based at least in part on a concern that, even if pragmatic considerations of judicial economy point toward accepting jurisdiction, 'a rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay . . . collateral orders into multi-issue interlocutory appeal tickets.'" Moore, 57 F.3d at 930 (quoting Swint, 514 U.S. at 49-50). Moreover, even if the purpose of our exercise of pendent jurisdiction is to conserve judicial resources and promote judicial efficiency, the aggregate effect of the seemingly efficient disposition of the individual case is to "invite frequent extensive briefing and argument of issues that should not be reviewed because review would substantially increase the danger of untoward interference with the trial process." Charles Alan Wright et al., 16 Federal Practice and Procedure: Jurisdiction 2d, § 3797, at 696 (1996).

In Moore, we considered pendent state claims against defendants City of Wynnewood and its chief of police where the disposition of the interlocutory appeal over which we had jurisdiction—the denial, based solely on an abstract issue of law, of the police chief's motion for summary judgment based on a qualified immunity defense—necessarily disposed of many of the otherwise unappealable claims under pendent appellate jurisdiction. Because plaintiff failed

to show the violation of his constitutional rights, we reversed the district court's denial of the City's motion for summary judgment on state tort and 42 U.S.C. § 1983 claims. See Moore, 57 F.3d at 935-36. Following Moore, we have carefully exercised pendent jurisdiction only where the legal and factual claims are very closely related. See, e.g., United Transportation Union Local 1745 v. City of Albuquerque, 178 F.3d 1109, 1114-15 (10th Cir. 1999); Armijo, 159 F.3d at 1265; Garramone v. Romo, 94 F.3d 1446, 1452 (10th Cir. 1996); Law v. National Collegiate Athletic Ass'n, 134 F.3d 1025, 1028 (10th Cir. 1998).

Accordingly, our application of the "inextricably intertwined" standard for exercising pendent jurisdiction over interlocutory appeals must be narrowly focused on those claims the review of which would not require the consideration of legal or factual matters distinct from those raised by the claims over which we unquestionably have jurisdiction. We therefore decline to exercise jurisdiction over appellants' claims that the district court erred when it accepted and relied upon inadmissible hearsay evidence in its denial of their motion for summary judgment, upheld plaintiffs-appellees' outrageous conduct claim, and held in abeyance appellants' motion for attorney fees.

We may, however, exercise pendent appellate jurisdiction over appellants' claim that the district court erred in dismissing plaintiffs-appellees' conspiracy claim for damages under 42 U.S.C. § 1985, because we necessarily considered the

issue in our review of the district court's denial of Coleman's absolute immunity defense.  See Part II, supra.  Appellants' legal challenge to the conspiracy claim is based solely on their contention there was no constitutional deprivation.  This challenge necessarily fails given our resolution of appellants' immunity claims. We do not disturb the district court's finding of disputed facts sufficient to allege concerted action.  See Johnson, 515 U.S. at 313; Clanton, 129 F.3d at 1153. Accordingly, we affirm the district court's refusal to dismiss plaintiffs-appellees' 42 U.S.C. § 1985 conspiracy claim.

## V

We **AFFIRM** the district court's denial of Coleman's motion for summary judgment on absolute immunity grounds; we **AFFIRM** the district court's denial of both appellants' motion for summary judgment on qualified immunity grounds; we **AFFIRM** the district court's denial of appellants' motion for summary judgment on appellees' conspiracy claim; and we **DISMISS** appellants' remaining claims for lack of jurisdiction.  We **GRANT** Plaintiffs-Appellees' unopposed Amended Motion to File Documents Under Seal.