FILED
United States Court of Appeals
Tenth Circuit

July 8, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

PAUL BERRYMAN and YI LU,
individually and as next of friends and
parents of minor child M.B.; KATELYNN
BERRYMAN, individually,

     Plaintiffs - Appellees,

v.

ROBIN NICETA, in her individual
capacity,

     Defendant - Appellant.

No. 23-1263

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:23-CV-00285-CNS-NRN)**
_____

Peter H. Doherty, Lasater & Martin, P.C., Greenwood Village, Colorado, for Defendant-Appellant.

Elliot A. Singer, Conduit Law, LLC, Denver, Colorado, for the Plaintiffs-Appellees.
_____

Before **TYMKOVICH**, **SEYMOUR**, and **EID**, Circuit Judges.
_____

**EID**, Circuit Judge.
_____

    Appellant Robin Niceta, a former caseworker with the Arapahoe County

Department of Human Services, was assigned to investigate allegations of child

abuse against Paul Berryman, a father to two girls. During her investigation, Niceta allegedly made false statements regarding Berryman's purported abuse in order to remove Berryman's daughters from his custody. Niceta's alleged false statements came at various stages of the investigation and custody proceedings, and they ultimately resulted in the removal of Berryman's daughters for a year and a half.

When Berryman and his wife eventually regained custody, they and their daughters collectively sued Niceta under 42 U.S.C. § 1983, alleging, among other things, that Niceta's conduct violated the family's procedural and substantive due process rights under the Fourteenth Amendment. Niceta moved to dismiss the claim, asserting (as relevant here) (1) qualified immunity and (2) absolute testimonial immunity for statements she made at a custody hearing. The district court denied Niceta's motion on all grounds, and this interlocutory appeal followed.

Reviewing de novo, we agree with the district court that Niceta is not entitled to qualified immunity because she failed to adequately raise the defense. But we part ways with the district court as to Niceta's claim of absolute testimonial immunity. On that issue, we hold that Niceta is entitled to absolute immunity for statements she made during her testimony at the custody hearing (but not for statements made outside of that hearing). We accordingly vacate the district court's judgment and remand for the district court to determine whether any of the Berrymans' claims can survive without considering Niceta's testimonial statements made at the custody hearing.

2

**I.**

Robin Niceta was a caseworker with the Arapahoe County Department of Human Services ("ACDHS"). In January 2021, Niceta was assigned to investigate allegations that Paul Berryman sexually abused his daughter, Katelyn.[1] The investigation began after ACDHS received a referral from the Aurora Police Department regarding "credible concerns" that an older male from North Carolina had groomed and sexually assaulted Katelyn. App'x Vol. I at 7. The concerns cited in the referral were reported by Discord, an online chat platform on which Katelyn and the older male had communicated. Discord provided transcripts of conversations between Katelyn and the older male, in which Katelyn described being sexually and physically abused by her father and expressed fear that her father might begin abusing her younger sister, M.B.

Before the investigation formally commenced, Niceta twice called the Berrymans and left voicemails, which were not returned. Eventually, Niceta reached Berryman and his wife (Katelyn and M.B.'s mother), Yi Lu, on the phone. During that call, Berryman told Niceta that he had retained an attorney and would only permit Niceta to interview Katelyn and M.B. if his attorney was present.

After the phone call, ACDHS formally petitioned the Arapahoe County District Court to authorize a dependency-and-neglect investigation. The petition was

---

[1] Although Katelyn's name is spelled "Katelynn" in our caption, the correct spelling appears to be "Katelyn" based on the district court's caption and the spelling used throughout the record and briefing on appeal. We therefore use the latter spelling in the body of our decision.

based both on the allegations in the referral to ACDHS as well as Niceta's assertions

that the Berrymans had not returned her voicemails and "would not allow the

children to be interviewed." *Id.* at 8. The state court granted the ACDHS petition,

authorizing Niceta to interview the children outside of their parents' presence and to

separately interview both parents.

Once they had been served with the order granting the petition, Berryman and

Lu informed Niceta that they would make their daughters available for an interview

outside of their presence. The parties then agreed to schedule the interview for

February 1, 2021. On January 29, however, the attorney for the two children asked to

reschedule the interview. ACDHS and Niceta did not agree to reschedule the

interview and instead "threatened to set a hearing" for February 2 regarding

Berryman and Lu's compliance with the state-court order. *Id.* at 10.

On February 1—the date the interview was originally scheduled to take

place—Niceta contacted the state-court judge to obtain a Verbal Removal Order

("VRO").[2] In support of the VRO, Niceta submitted a written statement that

described prior allegations regarding Berryman, including separate allegations that

Katelyn had made against him four years earlier, as well as other allegations that

ACDHS had previously investigated and determined to be unfounded. Niceta's

statement did not reference any allegations regarding Berryman's conduct within the

---

[2] A VRO is an ex parte order authorizing the removal of a child or children
from their parents' custody, on an emergency basis, based on the caseworker's
allegations and without notice to the parents. *See* Colo. Rev. Stat. § 19-3-403.

immediately preceding year, nor did it include any allegations concerning Lu, other than an allegation that Katelyn felt "disappointed" because Lu did not believe Katelyn's allegations. *Id.*

As to M.B.—Katelyn's younger sister—Niceta sought the VRO only on the grounds that M.B. was then "the same age that Katelyn was when she was first assaulted" by Berryman. *Id.* at 11. Niceta asserted that there was "grave concern that [M.B.] [was] in danger of being sexually assaulted" by Berryman at the time. *Id.* at 12.

Niceta's statement in support of the VRO also described Berryman and Lu's purported non-cooperation with the investigation and non-compliance with the state-court order. Specifically, Niceta asserted that Berryman had made "numerous attempts to keep Katelyn from talking to the police and DHS." *Id.* at 11. Although Niceta mentioned that Berryman had hired an attorney "both for the girls and himself," Niceta's statement did not disclose the efforts made by the children's attorney to reschedule the February 1 interview that had been cancelled. *Id.* at 12. Niceta also claimed she was "concerned that Katelyn [was] continuing to withhold the truth in order to protect her sister and her family life," and she stated that Katelyn wanted "to express what has happened" and to "ensure [M.B.]'s safety but she will not and cannot do this until she feels safe from her father." *Id.* In their complaint, the Berrymans alleged that these statements were false.

5

Based on Niceta's written statement, the state-court judge entered the VRO on February 1, 2021. That same day, Katelyn and M.B. were removed from their parents' custody and placed in foster care.

On February 2, ACDHS filed a petition to launch a formal investigation (the "ACDHS petition"), which included the same allegations as Niceta's VRO statement. The ACDHS petition also contained statements regarding Katelyn and M.B. that had been "'cop[ied] and pasted' from previously used petitions" and that were not accurate, including that the girls "(a) were homeless; (b) had run away; and (c) tested positive at birth for a controlled substance." *Id.* at 14.

A week later, the state court held a custody hearing in which Niceta, Berryman, and Lu all participated. During the custody hearing, Niceta testified, under oath, that although the Berrymans had two prior "interactions" with ACDHS, the first one terminated after the family agreed to "partner" with ACDHS, and the second one terminated after Katelyn recanted her allegations of sexual abuse (although Niceta also testified that Katelyn's recantation "was not believable"). *Id.* at 15. Niceta also testified regarding Berryman and Lu's cooperation with her investigation, stating that Berryman's decision to retain legal counsel was "creat[ing] barriers," but also acknowledging that the parents had arranged for both daughters to be interviewed in the presence of their attorney. *Id.* at 16.

Additionally, Niceta testified that Katelyn—in the time since her removal— had stated that she "misse[d]" Berryman's touch, massages, and voice, missed sleeping with him in his bed, and "fantasizes about him all day long." *Id.* Similarly,

6

Niceta testified that Katelyn had previously told Niceta that Katelyn gave Berryman baths, although—according to Berryman and Lu—Katelyn's statement was actually referring to giving the family *dog* a bath. *Id.* at 17.

Niceta also testified that M.B. had previously stated that Berryman sleeps with her as well, and that she was "not allowed to tell anybody their business because if she does, bad things will happen." *Id.* The Berrymans allege in their complaint that this testimony was false, too. Finally, Niceta testified that Paul Berryman had been investigated not only for sexual abuse but also for sex *trafficking*—although, like Niceta's other assertions, the Berrymans allege that Paul "had never even been investigated" for sex trafficking. *Id.*

At some point in August 2021, a forensic interview was conducted of Katelyn, during which she recanted the allegations she had made about Berryman's sexual abuse. Sometime shortly after Katelyn's recantation, Niceta told Katelyn that she "deserved this." *Id.* at 21. Eventually, Niceta was removed from the child-abuse investigation and proceedings. In the months following, Berryman and Lu completed treatment plans, and the child-abuse case was eventually dismissed.

Berryman, Lu, Katelyn, and M.B. then collectively filed an action for monetary relief against Niceta under 42 U.S.C. § 1983, alleging that Niceta violated the family's procedural and substantive due process rights under the Fourteenth Amendment by making false statements in support of the VRO, in support of the petition to investigate, and at the custody hearing.

7

Niceta moved to dismiss the complaint, on the bases that (among other things) (1) the plaintiffs failed to state a claim for a violation of procedural or substantive due process, (2) Niceta is entitled to absolute testimonial immunity, and (3) Niceta is entitled to qualified immunity.

The district court denied Niceta's motion on all grounds. As relevant to this appeal, the district court reasoned that (1) Niceta was not entitled to qualified immunity because the defense was not "adequately presented," and (2) Niceta was not entitled to absolute testimonial immunity because she "allegedly falsified information" and "was testifying more as an investigative officer . . . than as an advocate." App'x Vol. I at 82–93. Niceta timely appealed, challenging only the district court's conclusions regarding qualified immunity and absolute testimonial immunity.

## II.

### A.

We begin with Niceta's qualified-immunity claim, the denial of which we review de novo. *See Tonkovich v. Kans. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant raises the defense of qualified immunity, "the

8

plaintiff carries a two-part burden to show:  (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."  *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (quotation omitted).  Thus, to survive a motion to dismiss based on qualified immunity, a plaintiff "must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008).

But to trigger the plaintiff's two-part burden, a defendant must first "adequately present" the qualified-immunity defense.  *Tillmon v. Douglas County*, 817 F. App'x 586, 589 (10th Cir. 2020) (unpublished);[3] *see Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980) (holding that "the burden of pleading" a qualified-immunity defense "rests with the defendant").  And to adequately present the defense, the defendant must not only explicitly raise it, *see Montoya v. Vigil*, 898 F.3d 1056, 1063–64 (10th Cir. 2018), but must also plead the defense beyond a "perfunctory assertion," *Tillmon*, 817 F. App'x at 590.  Accordingly, where a defendant makes only a bare assertion of qualified immunity, the plaintiff bears no burden to satisfy the ordinary two-prong test.  *See id.*; *A Brighter Day, Inc. v. Barnes*, 860 F. App'x 569, 575 (10th Cir. 2021) (unpublished) (holding that a defendant's "qualified-

---

[3] Unpublished cases cited in this decision are not binding precedent, but we consider them for their persuasive value.  *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

immunity argument was underdeveloped" where it "contain[ed] mostly general legal statements and empty platitudes").

Finally, in raising a qualified-immunity defense, a defendant may not merely rely on substantive legal arguments based on the Rule 12(b)(6) failure-to-state-a-claim standard. *Tillmon*, 817 F. App'x at 590; *Montoya*, 898 F.3d at 1064–65 (holding that a "failure-to-state-a-claim argument, without more, is insufficient to raise qualified immunity" because "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 527–28 (1985))).

**B.**

As an initial matter, we have jurisdiction to consider the denial of Niceta's qualified-immunity defense because the denial falls within the collateral-order doctrine and is therefore an appealable interlocutory decision. *See Mitchell*, 472 U.S. at 530; *Montoya*, 898 F.3d at 1063 ("[T]he true jurisdictional inquiry is whether or not the district court decided the qualified immunity question at issue, not whether the defendants adequately raised the defense."). Nevertheless, we decline to reach the merits of Niceta's qualified-immunity argument for the same reason as the district court: Niceta did not adequately raise it.

The district court reasoned that Niceta failed to adequately raise the defense because her motion to dismiss merely "recite[d] the qualified immunity legal standard, state[d] that the Tenth Circuit has recognized the difficulties of protecting minor children, briefly describe[d] her role in the underlying proceedings, then—in a

10

single sentence, without citation to any legal authority—state[d] that no clearly established law demonstrates these facts give rise to personal liability." App'x Vol. I at 91. We agree. Consisting of less than a page, Niceta's cursory argument makes no attempt to analyze any facts within the applicable legal framework, and so it provides no clear factual or legal basis for asserting the defense. And, lacking that substance, Niceta's argument likewise provides no meaningful way for the Berrymans to respond and satisfy their burden under the two-prong test for qualified immunity.

On appeal, Niceta argues that she "present[ed] extensive argument on the first prong of qualified immunity on the merits of whether Plaintiffs had alleged constitutional violations." Aplt. Br. at 32. But this argument fails for a simple reason: it conflates her 12(b)(6) arguments (regarding the merits of the Berrymans' substantive and procedural due process claims) with the first prong of the qualified immunity analysis (which requires that the defendant's actions violated a federal constitutional or statutory right).

A defendant cannot simply point to 12(b)(6) arguments, without more, in support of a qualified-immunity defense. *See Tillmon*, 817 F. App'x at 590; *Montoya*, 898 F.3d at 1064–65. Niceta's arguments on the first prong, both in her motion to dismiss and in her briefing on appeal, do nothing more than make passing references to her separate arguments that the Berrymans' complaint failed to state a claim for relief. Indeed, in arguing that she adequately raised the first prong of the defense, Niceta's brief cites *only* to the portions of her motion to dismiss that discuss her 12(b)(6) arguments, rather than her qualified-immunity argument. *See* Aplt. Br.

at 32–33 (citing App'x Vol. I at 43–47).[4]  Those arguments cannot substantiate her defense.

Niceta also argues that she "included case law and case specific arguments" in her discussion of the second prong of qualified immunity, including by discussing "the difficulties posed to those tasked with minor children" and by citing "two separate cases regarding qualified immunity."  *Id.*  But, as the district court pointed out, Niceta's only statement regarding the second prong was that "[n]o clearly established law clearly shows this pattern of facts as supporting personal liability" of Niceta.  App'x Vol. I at 49.  What's more, the two cases Niceta *did* cite in the sentences preceding that statement do not discuss the second qualified-immunity prong at all (save for one unrelated—and uncited—portion discussing a parent's right to direct his or her child's medical care).  *See PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1201 (10th Cir. 2010); *Everhart v. N.M. Child. Youth & Fam. Servs.*, No. 20-2078, 2022 WL 110835, at *9 (10th Cir. Jan. 12, 2022).

---

[4] The portions of Niceta's motion to dismiss to which she cites in her brief are under headings specifically labeled for her 12(b)(6) arguments—that is, her arguments regarding the merits of the Berrymans' substantive and procedural due process claims.  *See* App'x Vol. I at 43–45 (under the heading "Plaintiffs' Claim of a Substantive Due Process Violation of Familial Association Fails as a Matter of Law"); *id.* at 45–47 (under the heading "Plaintiffs' Procedural Due Process Claim Fails as Plaintiffs Participated in the State Court Proceedings and Waived Further Process by Entering into Deferred Adjudications").  Meanwhile, Niceta's argument regarding the first prong does not cite at all to the portion of her motion to dismiss that actually discusses qualified immunity.  This underscores the fact that Niceta's qualified-immunity argument rests entirely on her 12(b)(6) arguments, which is insufficient to raise the defense.

Again, without citation to any legal authority or other reasoning, Niceta's perfunctory assertion of qualified immunity in this way is insufficient. Thus, we hold that Niceta has failed to adequately raise the defense, and so we affirm the district court's denial of qualified immunity.

### III.

### A.

We turn next to the district court's denial of absolute immunity based on the allegedly false statements that Niceta made at the temporary custody hearing. On this issue, we disagree with the district court. Reviewing de novo, *see Malik v. Arapahoe Cnty. Dept. of Soc. Servs.*, 191 F.3d 1306, 1313 (10th Cir. 1999), we hold that Niceta is entitled to absolute immunity for statements she made during her testimony at the custody hearing (but not for statements made outside of that hearing).

The defense of absolute immunity "offers certain government officials total protection from a suit for damages under 42 U.S.C. § 1983." *Thomas v. Kaven*, 765 F.3d 1183, 1191 (10th Cir. 2014). The Supreme Court has applied the defense "in several well-established contexts involving the judicial process." *Snell v. Tunnell*, 920 F.2d 673, 686 (10th Cir. 1990). One such context involves government officials "who initiate and prosecute enforcement proceedings subject to agency adjudication." *Id.*; *see Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976) (holding that prosecutors are absolutely immune for conduct that occurs "in initiating a prosecution and in presenting the State's case"). The principal rationale for applying absolute immunity

13

in this context is "to allow functionaries in the judicial system the latitude to perform their tasks absent the threat of retaliatory § 1983 litigation." *Snell*, 920 F.2d at 686–87.

Another context involves the function of witnesses who testify in judicial proceedings. Witnesses, "including public officials and private citizens," are entitled to absolute testimonial immunity from civil suits for damages based upon their testimony. *Id.* at 686; *Briscoe v. LaHue*, 460 U.S. 325, 334–35 (1983). And when absolute testimonial immunity attaches, it bars *all* claims based on the witness's testimony—even if it is perjurious. *See Briscoe*, 460 U.S. at 342–43.

But absolute immunity, though total in its protection, is not without limits. There are some circumstances in which absolute immunity will not attach. Specifically, when determining whether a defendant is entitled to absolute immunity, the Supreme Court has consistently applied "a 'functional' approach," looking at "the nature of the functions with which a particular official or class of officials has been lawfully entrusted." *Forrester v. White*, 484 U.S. 219, 224 (1988); *see Snell*, 920 F.2d at 687 (noting that, consistent with *Forrester*, lower courts "have taken a functional approach rather than one based purely on the status of the defendant involved"). And "[t]he more distant a [defendant's] function is from the judicial process, the less likely absolute immunity will attach." *Snell*, 920 F.2d at 687.

In applying absolute testimonial immunity for witnesses, "[t]he central focus . . . has been the nature of the judicial proceeding itself" and the function of the testifying witness, rather than the witness's identity or status. *Briscoe*, 460 U.S. at

14

334. Generally, the types of judicial proceedings protected by absolute immunity are those in which a witness is "subject to compulsory process, takes an oath, responds to questions on direct examination and cross-examination, and may be prosecuted subsequently for perjury." *Id.* at 342–43.

In the specific context of government actors "involved in child protection and advocacy," including caseworkers investigating child-abuse allegations, this Court has continued to apply that functional approach. *Snell*, 920 F.2d at 687. In doing so, we have held that caseworkers are not entitled to absolute immunity when their challenged conduct was undertaken "in an investigative, rather than a prosecutorial capacity," drawing analogies to cases involving prosecutorial immunity. *Id.* at 675.

Thus, where a social worker's challenged conduct occurs in the process of initiating an investigation or securing an initial, pre-adjudicatory removal, absolute immunity does not attach. For example, in *Snell v. Tunnell*, this Court rejected an absolute-immunity defense for social workers whose challenged conduct occurred while investigating the plaintiffs for child abuse. *See id.* at 688. During the child-abuse investigation, the defendant social workers made false allegations regarding the plaintiffs in support of an order to remove several children from the plaintiffs' custody prior to a formal petition or hearing. *See id.* at 690 (noting that the defendants' challenged conduct involved filing an "application" for a "pick-up order," or a removal order, which was "pre-adjudicatory and sought information . . . prior to the filing of a petition").

15

The Court in *Snell* held that the defendants were not entitled to absolute immunity because their allegations about the plaintiffs were made in an investigatory capacity (that is, as part of the defendants' efforts to justify further investigation). *Id.* at 689–92; *see Spielman v. Hildebrand*, 873 F.2d 1377, 1382–83 (10th Cir. 1989) (denying absolute immunity to a social worker for her decision to remove two children from their home without a hearing because the defendant's conduct "in no way related to advocacy before a judicial body"); *Austin v. Borel*, 830 F.2d 1356, 1361–63 (5th Cir. 1987) (denying absolute immunity to a social worker for "the filing of an allegedly false verified complaint, which under Louisiana [l]aw initiated temporary custody of a child, but did not initiate the judicial process concerning need of care proceedings").

By contrast, this Court has distinguished between statements made in support of an initial application for a removal order and statements made "[w]hen testifying as a witness under oath," holding that social workers and caseworkers *are* entitled to absolute testimonial immunity for the latter. *English v. LeBaron*, 3 F. App'x 872, 873 (10th Cir. 2001) (unpublished); *see Miller v. Glanz*, 948 F.2d 1562, 1570 (10th Cir. 1991). Thus, in *English*, we upheld a grant of absolute immunity to a social worker in a suit based upon his testimony in a judicial proceeding. 3 F. App'x at 873. The Court reasoned that the absolute-immunity inquiry "analogize[s] the activities of those who investigate child abuse claims to those of law enforcement officers." *Id.* And because "all witnesses are absolutely immune from damages liability based on their testimony," social workers, too, are absolutely immune for

16

testimony made as a witness under oath. *Id.*; *see Gomez v. Nickerson*, No. 1:22-cv-01546, 2023 WL 11877648, at *3 (D. Colo. Mar. 28, 2023) (concluding that two social workers were absolutely immune from suit for claims based on their testimony at a dependency and neglect trial).

**B.**

The absolute-immunity issue in this case requires us to parse out two categories of allegations from the Berrymans' complaint: (1) allegations related to statements Niceta made *outside* of the custody hearing, including those in support of the VRO and the initial ACDHS petition to begin the child-abuse investigation; and (2) allegations related to statements Niceta made *during* the custody hearing, where she provided sworn testimony (and where she allegedly made additional false statements). At bottom, the parties' absolute-immunity arguments revolve around the second category of statements—that is, the parties dispute whether Niceta's statements during the custody hearing were made in an investigatory capacity (with no absolute-immunity protection) or as a testifying witness (entitling her to absolute immunity).

As Niceta points out, the Berrymans' complaint is largely comprised of allegations regarding Niceta's testimony at the custody hearing. Niceta focuses on these allegations, contending that she is entitled to absolute immunity specifically as to her testimony. Moreover, Niceta insists that if she is entitled to absolute immunity—even solely for her testimonial statements—then the defense altogether

bars the Berrymans' substantive and procedural due process claims, because those claims each relied extensively on Niceta's testimony.

But that is only half the story. The Berrymans' complaint also consists of several allegations regarding false statements Niceta made *prior* to the custody hearing, including the statements Niceta made in support of the VRO and the ACDHS petition. According to the Berrymans, Niceta is not entitled to absolute immunity for these statements, because the statements were investigatory in nature and were made solely for the purpose of justifying both the ACDHS petition to investigate and the ex parte order for the children's removal. Likewise, the Berrymans contend that Niceta is not entitled to absolute immunity *even as to her custody hearing testimony*, because this testimony—"although [made] in a formal courtroom setting"—was "no different than [the statements] she made" in support of the VRO. Aple. Br. at 26.

As an initial matter, it is clear that—as the Berrymans argue, and as Niceta appears to concede—Niceta is *not* entitled to absolute immunity for any statements she made outside of the custody hearing, including the statements she made in support of the VRO. Those statements, like the statements at issue in *Snell*, were made purely in an investigatory capacity because they were made at a pre-adjudicatory stage, before ACDHS had even filed its petition to launch a formal investigation. *See* 920 F.2d at 688–90.

But the nature of Niceta's testimony *during* the custody hearing is less clear. The custody hearing, although a proceeding before a judge, occurred early on in the

18

investigation—only one week after ACDHS filed its formal-investigation petition—and resulted only in a temporary loss of custody. With that in mind, the custody hearing does not fit neatly into the functional absolute-immunity test, as we have applied that test in the past. We must therefore decide whether, as a functional matter, the custody hearing was an investigatory, pre-adjudicatory proceeding, or whether it was a true judicial proceeding.

We take the latter view: the temporary custody hearing was a judicial proceeding for purposes of absolute immunity. We therefore hold that Niceta is entitled to absolute immunity for the statements she made at that hearing. As the Berrymans' complaint acknowledges, Niceta's statements during the custody hearing were made as part of her "sworn testimony" given "under oath." App'x Vol. I at 15. That concession is important: because Niceta's statements were made while she was "testifying as a witness under oath," her testimonial statements are entitled to absolute immunity, regardless of her status as a caseworker for ACDHS. *English*, 3 F. App'x at 873. Likewise, the Berrymans' complaint states that Niceta was subject to cross-examination during the custody hearing. *See* App'x Vol. I at 18–20. Because Niceta not only took an oath but also "respond[ed] to questions on direct and cross-examination" during the hearing, she was "perform[ing] the same functions as any other witness." *Briscoe*, 460 U.S. at 342.

Moreover, at the time of the custody hearing, the VRO had already been granted, and ACDHS had already filed its formal petition to investigate, making the circumstances unlike those in *Snell* (where the challenged statements were made

19

*prior* to the filing of a petition to investigate). *See* 920 F.2d at 673.[5]  In other words, Niceta's statements in support of the VRO and the ACDHS petition were "pre-adjudicatory" or investigatory. *See id.*  Her testimony at the hearing was not. Niceta's testimony, unlike her prior statements, occurred once the adjudicatory process had already begun.  All told, these facts show that Niceta's testimony at the custody hearing was given in her functional capacity as a witness, rather than as an investigatory officer seeking to secure an initial removal or to justify further investigation.

In response, the Berrymans argue that Niceta's testimony at the hearing was given in an investigatory capacity, rather than as a witness, because "[t]he sole purpose of the Hearing was [to determine] where to place Katelyn and M.B."  Aple. Br. at 26.  And so, their logic goes, that purpose makes the custody hearing similar in nature to other pre-adjudicatory procedures, like the VRO.  To be sure, the custody hearing occurred at an early stage of the proceedings—only eight days after the VRO was entered, and only a week after ACDHS filed its formal petition.  And, as the Berrymans point out, Niceta's investigation apparently continued for over a year and a half after the hearing, which might—at first blush—seem to indicate that the hearing was intended to justify further investigation.

---

[5] The statements at issue in *Snell* were made in support of an application for an order to remove children from their parent's custody, which also "sought information" to be developed "prior to the filing of a petition."  920 F.2d at 690. That is more similar to Niceta's statements made in support of the VRO than those she made at the custody hearing.

But that argument misunderstands the nature and purpose of the custody hearing. Even construing the complaint's allegations in the light most favorable to the Berrymans, the purpose of the custody hearing was not to decide whether to remove Katelyn and M.B. *in the first place* (as was the case in *Snell*), but rather to determine whether their *continued* removal and placement in foster care was justified.

Colorado law makes this apparent. The Colorado Children's Code—which supplied the basis for Niceta to remove the Berryman children—provides that a state court "may issue verbal or written temporary custody orders or emergency protection orders, or both." Colo. Rev. Stat. § 19-3-405. When a child is taken into custody following either a temporary custody order or emergency protection order, "all parties have a right to a prompt hearing to determine whether the child is to remain out of the child's home for a further period of time." *Id.* § 19-3-402(1). Specifically, a temporary custody hearing must occur "within seventy-two hours after placement . . . to determine further custody of the child or whether the emergency protection order should continue." *Id.* § 19-3-403(3.5). The temporary custody hearing at issue in this appeal occurred pursuant to these provisions.

At the hearing, the court may receive evidence "in the form of written or oral reports, affidavits, testimony, or other relevant information," and "[a]ny information having probative value may be received by the court, regardless of its admissibility under the Colorado rules of evidence." *Id.* § 19-3-403(3.6)(a). Moreover, in connection with the temporary custody hearing, parents are entitled to receive a

"form affidavit and advisement" that must, among other things, (1) "[a]dvise the parent that he or she is required to provide the requested information fully and completely under penalties of perjury and contempt of court," (2) allow the parents to list contact information for, "and any comments concerning the appropriateness of the child's potential placement with, other relatives and kin," and (3) "[a]dvise the parent that failure to identify these relatives . . . may result in the child being placed permanently outside of the home of the child's relatives." *Id.* In essence, then, the form affidavit informs parents that the temporary custody hearing is a judicial proceeding that may affect their legal interests and custody rights.

These procedures suggest that temporary custody hearings are true judicial proceedings, entitling witnesses at those hearings (like Niceta) to absolute immunity for their testimony.[6] Because a judge at a custody hearing can receive evidence,

---

[6] There are very few state-court cases discussing the nature of these temporary custody hearings. Of those cases, almost all were decided in 2006 or earlier (with most being decided in the 1980s)—long before several relevant amendments to the Colorado Children's Code were adopted. And none of these cases discussed custody hearings in the context of absolute immunity. That said, the relevant state court cases do admittedly describe temporary custody orders as "pre-adjudicatory" proceedings. *W.H. v. Juv. Ct.*, 735 P.2d 191, 193 (Colo. 1987); *see, e.g.*, *People ex rel. M.W.*, 140 P.3d 231, 233 (Colo. App. 2006) ("[T]emporary protective custody orders . . . are interim orders pending a final factual determination of the allegations set forth in the petition in dependency or neglect.").

But those cases—and their "pre-adjudicatory language"—were based on the premise that temporary custody orders do not affect parents' *legal* rights to custody. *W.H.*, 735 P.2d at 193 (stating that the purpose of a temporary custody hearing "is not to determine a parent's legal interest in the child"); *M.W.*, 140 P.3d at 231 (same). That premise no longer holds true: at least as of 2021, the statute expressly states that a temporary custody hearing may furnish a basis for a court to issue orders for *either* legal or physical custody. Colo. Rev. Stat.§ 19-3-403(7). Additionally, after a custody hearing, if the court enters an order removing the child from the

22

listen to testimony, and hold parties or witnesses in contempt, the custody hearing itself is the typical sort of judicial proceeding to which courts have extended absolute immunity. *See Briscoe*, 460 U.S. at 342–43. Similarly, because the custody hearing can affect the legal interests and custody rights of parents—and because the judge may enter specific findings along with any orders it issues—then the hearing has a functionally different effect than the filing of an ex parte order or a petition to investigate, which are decidedly investigatory (and therefore not entitled to absolute immunity).

To sum up so far: a temporary custody hearing under Colorado law bears all the hallmarks of a typical judicial proceeding, even though it occurs early on in a child-abuse investigation. Temporary custody hearings thus function like true judicial proceedings—and so, we conclude, they are. The temporary custody hearing here was no different, and Niceta was acting as a witness at that hearing. We therefore hold that Niceta is entitled to absolute immunity for the statements she made during her witness testimony at the custody hearing.

---

parent's custody, "the court shall make the findings required pursuant to section 19-1-115(6) if such findings are warranted by the evidence." *Id.* That provision, § 19-1-115(6), applies "[a]ny time the court enters an order awarding legal custody of a child . . . to the department of human services," "even temporarily."

Thus, although a few state-court cases describe temporary custody hearings as "pre-adjudicatory," that label is misleading. A custody hearing, although temporary and not a final adjudication of whether children are legally deemed "neglected," nevertheless can affect a parent's legal rights to custody. Thus, taking a functional view, a custody hearing is effectively a judicial proceeding, such that witnesses at those hearings are entitled to absolute immunity.

Still, the issue remains whether, as Niceta argues, the grant of absolute immunity for those statements also necessarily requires dismissal of the Berrymans' complaint. At this stage, it does not. The district court held that the Berrymans' complaint alleged facts sufficient to state a claim for violations of procedural due process and substantive due process. That conclusion may well hold even without Niceta's statements from the custody hearing. Although the district court's reasoning with respect to the procedural due process claim relied on Niceta's statements at the custody hearing, the district court's analysis also referred more broadly to Niceta's "evidentiary falsification[s]" and seemingly cited to allegations regarding the VRO. App'x Vol. I at 89–90 (stating that Niceta "made several allegedly false—and significant—statements in the underlying proceedings"). The same is true of the substantive due process claim: the district court referred (and more explicitly, in fact) to allegations regarding the VRO, rather than merely pointing to Niceta's testimony.[7]

---

[7] Niceta argues in her brief that the Berrymans' allegations fail to state a claim in part because of admissions that they made in state court after the custody hearing. Specifically, in her motion to dismiss, Niceta claims that, following the custody hearing, and while the petition to investigate was still pending, the state court held a second hearing, during which both parents waived the right to a jury trial and instead entered "deferred adjudications." App'x Vol. II at 12, 20. As part of the deferred adjudications, the Berrymans agreed to a treatment plan that would "address the safety concerns" that "led to the adjudication of [Katelyn and M.B.] as dependent or neglected." *Id.* at 13, 21.

Because our review of the denial of a motion to dismiss is limited to the allegations in the complaint, we need not consider these facts, which were raised only in Niceta's motion to dismiss. *See Alvarado v. KOB-TV, L.L.C.*, 494 F.3d 1210, 1215 (10th Cir. 2007) (noting that, in reviewing a motion to dismiss, we only "review the

In any event, we need not pass on the sufficiency of the Berrymans' allegations or merits of their claims at this interlocutory stage. Accordingly, we remand to the district court to determine whether the Berrymans' allegations—minus those regarding the testimonial statements for which Niceta is entitled to absolute immunity—are sufficient to state a claim for relief.

## IV.

For the foregoing reasons, we AFFIRM the district court's denial of Niceta's motion to dismiss based on qualified immunity, but we VACATE the district court's denial of Niceta's motion to dismiss based on absolute immunity and REMAND for further proceedings consistent with this opinion.

---

factual allegations that should have been considered by the district court" and therefore do not consider facts raised outside of the complaint).